UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

NATIONAL RETAIL FEDERATION,                     :
                                                :     Case No. 1:25-cv-05500
                        Plaintiff,              :
                                                :
          - against -                           :     **COMPLAINT FOR**
                                                :     **DECLARATORY AND**
LETITIA JAMES, in her official capacity as      :     **INJUNCTIVE RELIEF**
Attorney General of New York,                   :
                                                :
                        Defendant.              :
                                                :
------------------------------------------------------- x

## I.     PRELIMINARY STATEMENT

1.     Retailers use algorithmic pricing to help customers save money. They accomplish this by using customers' purchase history, the items in their online shopping cart, their zip code, and other information that customers voluntarily share. Despite this, the State of New York will soon require many retailers to affix a misleading and ominous warning to *any* price set by an algorithm using any information that could be linked to a customer: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA." Although the State is free to express its opinion that algorithmic pricing is dangerous, it cannot force businesses that disagree to do so.

2.     Passed two months after its introduction with little deliberation, the New York Algorithmic Pricing Disclosure Act, N.Y. Gen. Bus. Law § 349-a (attached as Ex. A), is unsupported by any facts to suggest that algorithmic pricing itself deceives, confuses, misleads, or otherwise harms consumers. Instead, it appears based on a speculative fear that retailers use sensitive data to discriminate and price gouge—practices the law already prohibits. The Act arbitrarily exempts retailers in large sectors of the consumer economy, without any findings to support that distinction. The Act thus compels a broad range of retailers—but not all of them—to express a misleading and controverted government-scripted opinion without justification.

3.      Plaintiff National Retail Federation (NRF) is the world's largest retail trade association. NRF members use algorithmic pricing to help their customers discover products, save money, and enjoy a personalized experience. Pricing algorithms allow NRF members to conveniently offer promotions, adjust pricing, and reward customer loyalty for their millions of customers in New York. Research shows that pricing algorithms drive down overall consumer prices and reduce operational costs, including for smaller retailers. The Act compels NRF's members to impugn these pro-consumer practices against their will.

4.      "[T]he government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). NRF brings this action to vindicate its members' First Amendment right "to refrain from speaking" a message with which they disagree. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

## II.      THE PARTIES

5.      NRF is the world's largest retail trade association. Its member companies include discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and internet retailers from the United States and more than 45 countries. Many of its members use price-setting technologies covered by the Act to publish discounts and deals to customers in New York and are thus subject to its compelled speech requirement. NRF is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

6.      Defendant Letitia James is the Attorney General of New York and is exclusively charged with enforcing the Act. *See* N.Y. Gen. Bus. Law § 349-a(4).

## III.      JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over this action under 28 U.S.C §§ 1331 and 1343(a) because Plaintiffs' claims arise under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

8.      This Court has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because it presents an actual case or controversy within the Court's jurisdiction.

9.      Venue is proper in this District because Defendant resides in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to NRF's claims occurred in this District, 28 U.S.C. § 1391(b)(2). The Attorney General is authorized to sue and be sued in any district in New York State. *See* N.Y. Exec. Law § 63.

## IV.     FACTUAL ALLEGATIONS

### A.     NRF Members Use Algorithmic Prices to Deliver Lower Prices to Consumers

10.      NRF's members use data voluntarily shared by their customers to deliver deals, discounts, and curated shopping experiences. Often taking the form of common loyalty programs, these kinds of personalized promotions help consumers discover new products and save money. They also promote market efficiency, by ensuring goods are marketed to the people most likely to purchase them on terms they will accept.

11.      The mechanism for delivering this experience is commonly known as "algorithmic pricing." Pricing algorithms are just computer programs that analyze data and publish prices according to instructions developed by humans. They harness computational processing power to execute human judgments. For example, a large online retailer seeking to clear inventory of a particular shoe might use an algorithm to set a rule discounting the price of that shoe for customers who have added it to their shopping cart but not purchased it. A brick-and-mortar bookstore might use an algorithm to analyze sales records to determine which of its customers tend to enjoy political thrillers, and then send those customers an offer to buy a specially priced bundle of new novels in that genre. By analyzing customer inputs like purchase history, regional location, and demonstrated interest, pricing algorithms help companies offer promotions, adjust pricing, and

reward customer loyalty in ways that would otherwise be difficult if not impossible to do at scale. Thus, while "algorithmic pricing" is sometimes used pejoratively to refer to harmful pricing discrimination—practices that are already illegal under New York laws like N.Y. Civ. Rights Law § 40-C (discrimination), N.Y. Gen. Bus. Law § 396-r (price gouging), and N.Y. Gen. Bus. Law § 349 (unfair business practices)—it also encompasses a large range of consumer-friendly industry practices designed to lower prices and improve customer experience.

12.     Algorithmic pricing is different only in degree, not in kind, from longstanding retail practices. NRF members and other businesses have historically used data received in the ordinary course of business to provide promotions to customers. A grocer, for instance, may offer a coupon at check out for items similar to those purchased; gas stations offer free car washes to certain credit card holders; and coffee shops offer rewards cards giving repeat customers a free coffee every tenth cup. Through such targeted promotions, consumers save money while businesses optimize their inventory. Pricing algorithms today rely on the same types of commonplace, non-sensitive, and freely shared information to set prices. They simply do it with greater sophistication and on a much larger scale.

13.     For example, a retailer may offer coupons or "Buy X, Get Y" promotions to customers who have an item in their cart for a certain number of days, who have viewed multiple products made by a particular brand, or who have a history of buying the same item. These promotions—customized based on ordinary data about customers' purchasing habits or product preferences—allow such a member to deliver even better prices to customers for goods tailored to those customers' demonstrated interests. A retailer may also offer a price club subscription and use personal information identifying customers as a price club member to set additional discounts.

14.     Other NRF members—like Logic Products, Grill Sergeant, 3 Moms Organics, and

Ameribag—set prices using software they license from third-party vendors. Using algorithms to set prices reduces these businesses' operating costs by automating the complex, time-consuming task of setting and updating prices; managing inventory; and responding to market fluctuations. By streamlining this complex and data intensive process, algorithms allow smaller businesses and leanly staffed startups like these companies to operate more efficiently.

15.     Algorithmic pricing mechanisms *lower* overall consumer prices in the aggregate. Studies have consistently shown that algorithmic pricing incorporating data on market conditions plays a powerful role in driving prices down because algorithms allow companies to be more responsive to supply and demand and so better optimize pricing to reflect market conditions.[1] Independent and peer-reviewed studies confirm that price-setting algorithms generally benefit consumers by increasing market efficiency, lowering prices, increasing output, and decreasing companies' abilities to collude.[2]

**B.    New York Enacts the Algorithmic Pricing Disclosure Act**

16.     New York Governor Kathleen Hochul signed the New York Algorithmic Pricing Disclosure Act, N.Y. Gen. Bus. Law § 349-a, into law on May 9, 2025.

17.     ***Compelled Disclosure.*** The Act requires covered retailers who publish prices to

---

[1] *E.g.*, Kevin R. Williams, *The Welfare Effects of Dynamic Pricing: Evidence from Airline Markets*, 90 ECONOMETRICA 831-58 (Mar. 2022), https://doi.org/10.3982/ECTA16180; Alexander MacKay et al., *Dynamic Pricing, Intertemporal Spillovers, and Efficiency* (Harvard Bus. Sch. Strategy Unit), Working Paper (last revised Jan. 9, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4164271; *see also* Jerod Coker & Jean-Manuel Izaret, *Progressive Pricing: The Ethical Case for Price Personalization*, 173 J. OF BUS. ETHICS 387-98 (2021), https://doi.org/10.1007/s10551-020-04545-x.

[2] *E.g.*, Pedro Gonzaga et al., *Personalised Pricing in the Digital Era, Background Note by the Secretariat*, Directorate for Financial & Enterprise Affairs Competition Committee, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT ("OECD") (Nov. 28, 2018), https://www.oecd.org/content/dam/oecd/en/publications/reports/2018/10/personalised-pricing-in-the-digital-era_7313c12d/db4d9c9c-en.pdf; MacKay, *et al.*, *supra* note 1; Juan M. Elegido, *The Ethics of Price Discrimination*, 21 BUS. ETHICS QUARTERLY 633-60 (Oct. 2011), https://www.cambridge.org/core/services/aop-cambridge-core/content/view/EFFAB30A520782135D1EFF291F32E22E/S1052150X0001335Xa.pdf/the-ethics-of-price-discrimination.pdf; Williams, *supra* note 1.

New York consumers to place a conspicuous, consumer-facing disclosure next to all qualifying products and services stating: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA." N.Y. Gen Bus. Law § 349-a(2). The mandate applies not just to portions of product listings displaying a list price, but apparently even to compact banner ads and tiny thumbnails displaying products and a price. *Id*.

18.     ***Scope***. The Act sweeps broadly, but is simultaneously replete with arbitrary exemptions. The Act applies to any "entity that sets the price of a specific good or service using personalized algorithmic pricing" and that "directly or indirectly advertises, promotes, labels or publishes" that price to a New York consumer "using personal data specific to such consumer." *Id*. It requires that the disclosure appear alongside the published price of all goods or services generated using algorithmic pricing, in a "clear and conspicuous" format. *Id*. The Act defines "clear and conspicuous" to mean that the disclosure must appear "in the same medium as, and provided on, at, or near and contemporaneous with every" display or announcement of the price, "using lettering and wording that is easily visible and understandable to the average consumer." *Id*. § 349-a(1)(b).

19.     The Act reaches a wide range of garden-variety pricing practices. "Personalized algorithmic pricing" means "dynamic pricing set by an algorithm that uses personal data." *Id*. § 349-a(1)(f). "Algorithm" is any "computational automated process" using rules to define operations. *Id*. § 349-a(1)(a). "Personal data" encompasses any information that "identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device." *Id*. § 349-a(1)(d). "Dynamic pricing" refers to pricing that "fluctuates depending on conditions." *Id*. § 349-a(1)(e).

20.     But the Act carves out four categories of price displays that seemingly bear no

logical connection to each other or the Act's ostensible purpose. The Act exempts prices displayed for (i) some local delivery, ride-share, and taxi services that use location data (but not other data) to calculate trip pricing, (ii) consumer insurance products, (iii) consumer financial products and services sold by most banks, trust companies, credit unions, savings and loan associations, and industrial loan companies, and (iv) goods sold under a subscription-based agreement, if the price displayed is "less than the price for the same good or service set forth in the subscription-based agreement." N.Y. Gen. Bus. Law §§ 349-a(1)(d), (3). The Act gives no reason for treating advertisers offering these types of products or services any differently from others.

21.     ***Legislative History.*** The legislative history for the Act is sparse. The Act was passed less than two months after its introduction with little deliberation, no fact finding, and following on the heels of an incomplete study abandoned by the Federal Trade Commission (FTC).[3] That study, terminated less than six months after it began, resulted in the publication of undeveloped and unprecedented "initial observations" and "research summaries" over the dissent of two FTC Commissioners.[4] The summaries contain nothing to suggest consumers are deceived, confused, misled, or harmed by algorithmic pricing. And as both the FTC and New York State legislators have acknowledged, the report left much "more work" and research to be done before reaching any firm conclusions.[5] The State nevertheless appears to have relied on the FTC's

---

[3] Andrew N. Ferguson, Comm'r, Fed. Trade Comm'n, *Concurring Statement regarding Surveillance Pricing Intermediaries, Matter No. P246202* (July 23, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/surveillance-pricing-6b-ferguson-concurrence.pdf; Melissa Holyoak, Comm'r, Fed. Trade Comm'n, *Concurring Statement regarding Surveillance Pricing Intermediaries, Matter No. P246202*, (July 23, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/holyoak-concurring-statement-re-surveillance-pricing.pdf.

[4] FED. TRADE COMM'N, *FTC Surveillance Pricing 6(b) Study: Research Summaries; A Staff Perspective* (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/p246202_surveillancepricing6bstudy_researchsummaries_redacted.pdf.

[5] Alfred Ng, *The fight over unfair pricing goes national*, POLITICO (May 28, 2025), https://www.politico.com/news/2025/05/28/trump-surveillance-pricing-00370566.

incomplete efforts to pass the Act.[6] Nothing in the Act itself or the legislative record provides evidence that the Act addresses any real consumer injuries. The Act makes no findings, the legislature held no substantive hearings, and there is thus no legislative record to substantiate the Act's apparent assumptions.

22.     *Enforcement.* The Act takes effect July 8, 2025. *See* N.Y. S.B. 3008, ch. 58, pt. X, § 1, 248th Reg. Sess. (N.Y. 2025). Only Defendant New York Attorney General may enforce the Act. *See* N.Y. Gen. Bus. Law § 349-a(4). The Attorney General must first send a cease-and-desist letter identifying the alleged violations, and if the target does not cure them within a time period set at her discretion, she may seek injunctive relief and penalties of up to $1,000 per violation. *Id*. A single product displayed to just 1,000 customers without the State's scripted warning thus exposes a business to a $1 million penalty.

**C.     The Act Compels NRF Members To Publish Misleading Government Opinions They Oppose, Crowding Out and Undermining Their Own Speech.**

23.     If the Act is not enjoined, NRF members will be forced to endorse a baseless government opinion at war with their own convictions and that misrepresents their actual practices. This forces retailers to risk the loss of consumer trust, incur non-recoverable compliance costs, and face ongoing regulatory uncertainty—i.e., chilling effects on their speech and commercial choices—as to whether their services will be deemed to satisfy the Act's vague and overbroad prohibitions.

24.     *The Act Compels NRF Members To Convey Misleading Messages They Oppose.* Because retailers often set prices using information shared by their customers, the Act will apply to most, if not all in the case of some retailers, products they sell. And because the Act requires

---

[6] *Id*.

8

that the mandated disclosure be provided "contemporaneous with every advertisement, display, image, offer, or announcement of a price," N.Y. Gen. Bus. § 349-a(b), it apparently requires retailers to place the warning not only on product pages and mobile apps, but also on search result pages, on "suggested product" pages, in the customer's cart, and on advertisements for products hosted on third-party websites. Ensuring this disclosure appears for millions of New York customers for countless products in an indefinite number of places, both on and off its platform, will be costly. And because the Act applies only to New York consumers, NRF members will have to develop technology that uses location data to develop a virtual boundary around New York.

25.    The Act also applies to discounts offered to members of NRF retailers' price clubs. Although the Act includes an exception for prices offered to consumers based on subscriptions, the exception encompasses only discounted prices for goods or services that are "set forth in the subscription-based agreement or subscription-based contract." N.Y. Gen. Bus. § 349-a(3)(d). Some NRF members have club agreements that do not set forth specific static prices or discounts before sale. Offering discounts to members of such clubs would likely require a disclosure.

26.    The mandated disclosure will mislead consumers about the type of data NRF members use to set prices and the effect of personal data on prices. First, upon seeing the disclosure, many if not most consumers will naturally but falsely conclude that an NRF member relied on sensitive personal information (*e.g.*, age, gender, race, credit score, income level, specific geolocation) in setting the price. Second, many if not most consumers will naturally but again falsely conclude that the NRF member used this information to *increase* the price offered. These misconceptions will result not only from the imprecise, limited, and decontextualized nature of the mandated disclosure, but also popular media and politicians misunderstanding garden-variety processing algorithms and misrepresenting their risks—undermining the trust that consumers place

in NRF retailers like Logic Products, Grill Sergeant, 3 Moms Organics, and Ameribag, and in which these retailers have heavily invested. The Act thus has real impacts on sales, customer loyalty, and ultimately long-term financial performance.

27.    ***The Act Will Require Removal of NRF Members' Speech.*** The pixel space on any given product page is valuable real estate. The length and size of the mandated disclosure means that NRF retailers will have to surrender a significant amount of that space to the "conspicuous" mandated disclosure. N.Y. Gen. Bus. § 349-a(1)(b). Further, because the Act requires that the mandated disclosure be provided "contemporaneous with every advertisement, display, image, offer, or announcement of a price," NRF members are apparently required to place these disclosures not only on product pages, but also on search result pages, on "suggested product" pages, in the customer's shopping cart, and on advertisements for products hosted on third-party websites. *Id.*

### V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS: FREEDOM OF SPEECH

28.    NRF incorporates all prior paragraphs of this Complaint.

29.    "[T]he government may not compel a person to speak its own preferred messages." *303 Creative*, 600 U.S. at 586. Laws that compel speech are "presumptively unconstitutional" because they necessarily change the content of expression. *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citations omitted). These protections apply to commercial speech because "[t]he right not to speak inheres in political and commercial speech alike." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996). "The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and

information flourish." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (quotation omitted). A law thus implicates the First Amendment where it requires commercial speakers to endorse "speech with which they disagree." *Id.* at 411 (government could not compel business to subsidize advertising it opposed). That includes laws regulating how sellers may communicate their prices. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017).

30.     **Strict Scrutiny.** Although neither the Supreme Court nor the Second Circuit have applied strict scrutiny to compelled commercial disclosures, the Act should be subject to strict scrutiny because the Act compels speech at all, *NIFLA*, 585 U.S. at 766, and because it arbitrarily singles out some commercial speakers for "differential treatment" based on the subject matter of their advertisements in doing so. *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015). The Act exempts certain kinds of commercial speech based on the subject matter, topic, and speaker, including some local delivery, ride-share, and taxi services, as well as insurance products, and products offered by financial institutions. *See* N.Y. Gen. Bus. Law §§ 349-a(1)(d), (3). Even regulations of *unprotected* speech trigger First Amendment scrutiny when they make arbitrary content or viewpoint-based distinctions within those categories of speech unrelated to the reason that speech is unprotected in the first instance. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–90, 391–92 (1992). Strict scrutiny therefore should apply here.

31.     **Intermediate Scrutiny.** At a minimum, the intermediate scrutiny standard from *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557 (1980) applies to the Act because the Act compels commercial speech. The State cannot carry its burden even under intermediate scrutiny, which requires showing that (1) the Act actually and directly advances a real, non-speculative, and substantial state interest, and (2) the Act does not regulate more speech than necessary to achieve its end.

32.    The Act fails the first step of intermediate scrutiny because there is no evidence that the Act addresses any real consumer injuries. The Act makes no findings, the legislature held no substantive hearings, and there is accordingly no legislative record to substantiate any claim that the Act will have any impact in reducing any conceivable harms to consumers. *Cf. United States v. Virginia*, 518 U.S. 515, 516 (1996) ("justification" for law subject to heightened scrutiny "must be genuine, not hypothesized or invented post hoc in response to litigation"). Even if the ostensible harms addressed by the Act were real, the Act would not directly redress them because it contains unprincipled exceptions permitting those hypothetical harms in a significant range of uncovered applications. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999) (law regulating some gambling advertisements but not others was "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it").

33.    The Act also fails the second step of intermediate scrutiny because it sweeps broadly and is not narrowly tailored. The Act will compel its misleading and innuendo-laden warning to be displayed next to millions of products whether or not they are deceptive, discriminatory, or predatory, burdening discount offers and other pro-consumer efficiencies in every case. If the State is concerned covered businesses could leverage algorithmic pricing to price gouge consumers or discriminate by overcharging protected classes, the State has failed to show that "less speech-restrictive approaches would [not] sufficiently promote the asserted government interests." *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 280–82 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011). Existing laws provide obvious less restrictive alternatives.

34.    **Zauderer *Review.*** Under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), "purely factual and uncontroversial" disclosures aimed at preventing consumer deception must be "justified" and not "unduly burdensome." That standard does not apply here,

and even if it did, the Act fails that standard.

35.    *Zauderer* does not apply because the required warning does not seek to correct misleading commercial speech, and is neither purely factual nor uncontroversial. The term "personal data" is likely to evoke consumer concerns about sensitive or invasive surveillance, even though the Act defines it to include innocuous information like zip codes or loyalty program status. Coupled with the term "algorithm," the warning will falsely imply exploitative pricing, even in cases where it benefits the customer. *See Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023) (literally true scientific studies may be misleading if taken out of context). Moreover, forcing businesses to signal to customers that pricing is determined by "your personal data" potentially undermines trust and brand identity, and contradicts corporate messaging focused on customer-centric practices. *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (rejecting application of *Zauderer* review to law compelling a speaker to admit its own guilt).

36.    Even if applicable, the Act does not survive *Zauderer* review because the required disclosure is unjustified and unduly burdensome. The disclosure is unjustified because it is driven by transparency goals untethered from any evidence of real, cognizable harms or of actual consumer deception. *See Zauderer*, 471 U.S. at 651 (test requires mandated disclosure to be "reasonably related to the State's interest in preventing deception"). Moreover, it is based on the unfounded and incorrect assumption that personalized algorithmic pricing is inherently harmful to customers, when in fact it often benefits them. The required disclosure is also unduly burdensome because its strict formatting and placement requirements will displace important retail and advertising content that retailers wish to publish, and impinge upon retailers' ability to curate an environment to provide its customers with the shopping experience it wants.

13

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff National Retail Federation respectfully requests that the Court

1.       Declare that New York General Business Law § 349-a violates the First and Fourteenth Amendments of the United States Constitution on its face, and in its application against NRF members;

2.       Preliminarily and permanently enjoin Defendant and her agents, employees, and all persons acting under her direction or control from taking any action to enforce the Act, including as applied to Plaintiff's members;

3.       Enter judgment in favor of Plaintiff;

4.       Award Plaintiff its reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

5.       Award Plaintiff all other relief as the Court deem just and proper.

Dated: Seattle, Washington
       July 2, 2025

                                   Respectfully submitted,

                                   By: */s/ Ambika Kumar*
                                        Ambika Kumar

Adam S. Sieff (*pro hac vice* pending)          Ambika Kumar (*pro hac vice* pending)
Joseph Elie-Meyers (*pro hac vice* pending)     DAVIS WRIGHT TREMAINE LLP
DAVIS WRIGHT TREMAINE LLP                        920 Fifth Avenue, Suite 3300
350 South Grand Avenue, 27th Floor               Seattle, WA 98104-1610
Los Angeles, CA 90071-3487                       Telephone: (206) 622-3150
Telephone: (213) 633-6800                        ambikakumar@dwt.com
adamsieff@dwt.com
josepheliemeyers@dwt.com
                                                 Nimra H. Azmi (NY Bar # 5466693)
                                                 Alexandra Perloff-Giles (NY Bar # 5686944)
David M. Gossett (*pro hac vice* pending)        DAVIS WRIGHT TREMAINE LLP
DAVIS WRIGHT TREMAINE LLP                         1251 Avenue of the Americas, 21st Floor
1301 K Street NW, Suite 500 East                 New York, NY 10020-1104
Washington, D.C. 20005-3317                      Telephone: (212) 489-8230
Telephone: (202) 973-4200                        nimraazmi@dwt.com
davidgossett@dwt.com                             alexandraperloffgiles@dwt.com

                                                 *Attorneys for Plaintiff*
                                                 *National Retail Federation*