UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

NATIONAL RETAIL FEDERATION,                    :
                                               :
                      Plaintiff,               :
                                               :
            - against -                        :        Case No. 1:25-cv-05500
                                               :
LETITIA JAMES, in her official capacity as     :
Attorney General of New York,                  :
                                               :
                      Defendant.               :

------------------------------------------------------------ x


**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

RELEVANT BACKGROUND ...................................................................................... 2

    A.    NRF Members Use Algorithmic Pricing To Offer Lower Prices. ......................... 2

    B.    New York Forces NRF Members To Express Misleading Views About Algorithmic Pricing. ....................................................................................... 5

    C.    The Act Irreparably Harms NRF Members And Their Consumers. ..................... 8

LEGAL STANDARD ................................................................................................... 10

ARGUMENT ................................................................................................................ 11

I.    NRF Is Likely To Prevail On Its First Amendment Claim. ................................. 11

    A.    The Act Fails Intermediate Scrutiny. .............................................................. 12

    B.    The *Zauderer* Standard Does Not Save The Act. ........................................... 17

        1.    The *Zauderer* standard does not apply. ............................................ 17

            a.    The Act bears no relationship to deceptive advertising. ................ 17

            b.    The compelled message is not "purely factual." .......................... 18

            c.    The compelled message is controversial. ..................................... 20

        2.    The Act also fails under the *Zauderer* standard. ............................... 21

            a.    The Act's disclosure requirement is unjustified. ......................... 21

            b.    The Act's disclosure requirement is unduly burdensome. ............ 22

    C.    The Court Should Grant Facial Relief .............................................................. 24

II.    NRF Will Suffer Irreparable Harm Absent An Injunction. ................................. 25

III.    NRF Satisfies The Remaining Preliminary Injunction Factors. ......................... 26

CONCLUSION .............................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996)...............................................................................................12

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)...............................................................................................11

*725 Eatery Corp. v. City of N.Y.*,
408 F. Supp. 3d 424 (S.D.N.Y. 2019)...............................................................26, 27

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)...............................................................................................24

*AVCO Fin. Corp. v. Commodity Futures Trading Comm'n*,
929 F. Supp. 714 (S.D.N.Y. 1996) ........................................................................26

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020)...............................................................................................13

*Braynina v. TJX Companies, Inc.*,
2016 WL 5374134 (S.D.N.Y. Sept. 26, 2016)........................................................18

*Cal. Chamber of Com. v. Bonta*,
--- F. Supp. 3d ----, 2025 WL 1284779 (E.D. Cal. May 2, 2025)...........................19

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ..................................................................................19

*Central Hudson Gas & Elec. v. Public Serv. Comm'n*,
447 U.S. 557 (1980)....................................................................................12, 13, 14

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018)...................................................................................11

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)....................................................................................12, 13, 15

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) ..............................................................................17, 21

*CTIA v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .................................................................................20

*Deferio v. City of Syracuse*,
    193 F. Supp. 3d 119 (N.D.N.Y. 2016) ................................................................27

*DoorDash, Inc. v. City of N.Y.*,
    750 F. Supp. 3d 285 (S.D.N.Y. 2024) ..........................................................14, 18

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ...............................................................................................15

*Elrod v. Burns*,
    427 U.S. 347 (1976) ...............................................................................................25

*Expressions Hair Design v. Schneiderman*,
    581 U.S. 37 (2017) .................................................................................................11

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
    527 U.S. 173 (1999) .........................................................................................15, 23

*Ibanez v. Fla. Dep't of Bus. & Prof. Regul. Bd. of Accountancy*,
    512 U.S. 136 (1994) ...............................................................................................22

*IMDb.com, Inc. v. Becerra*,
    257 F. Supp. 3d 1099 (N.D. Cal. 2017), *aff'd,* 962 F.3d 1111 (9th Cir. 2020) ......22

*IMS Health Inc. v. Sorrell*,
    630 F.3d 263 (2d Cir. 2010), *aff'd,* 564 U.S. 552 (2011) ...........................13, 14, 16

*In re R.M.J.*,
    455 U.S. 191 (1982) ...............................................................................................17

*Int'l Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996) ...............................................................................11, 14, 21

*Kimberly-Clark Corp. v. D.C.*,
    286 F. Supp. 3d 128 (D.D.C. 2017) .....................................................................19

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) ...............................................................................................17

*Monserrate v. N.Y. State Senate*,
    599 F.3d 148 (2d Cir. 2010) ..................................................................................10

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) .........................................................................11, 20, 24, 25

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ...............................................................................................26

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ................................................................18, 21

*Nat'l Ass'n of Wheat Growers v. Bonta*,
    85 F.4th 1263 (9th Cir. 2023) ..................................................18, 19, 20, 21

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ................................................................................ *passim*

*NECD Corp. v. H&B, Inc.*,
    2008 WL 207843 (E.D.N.Y. Jan. 24, 2008),
    *aff'd*, 282 F. App'x 885 (2d Cir. 2008) ..................................................26

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020) ..............................................................10, 26

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ............................................................25, 27

*N.Y. State Ass'n of Realtors, Inc. v. Shaffer*,
    27 F.3d 834 (2d Cir. 1994) ..................................................................16

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ..............................................................................12

*R.J. Reynolds Tobacco Co. v. F.D.A.*,
    845 F. Supp. 2d 266 (D.D.C. 2012) ....................................................20

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ......................................................................11, 12, 13

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ................................................................25

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ..............................................................................16

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) ........................................................................15, 23

*Satellite TV of N.Y. Assocs. v. Finneran*,
    579 F. Supp. 1546 (S.D.N.Y. 1984) ....................................................26

*Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) ..............................................................................13

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ....................................................................12, 13, 16

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001)............................................................................................11

*United States v. Virginia*,
  518 U.S. 515 (1996)............................................................................................14

*Video Gaming Techs., Inc. v. Bureau of Gambling Control*,
  356 F. App'x 89 (9th Cir. 2009) .........................................................................26

*Wooley v. Maynard*,
  430 U.S. 705 (1977)..............................................................................................2

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ................................................................................... *passim*

**Constitutional Provisions**

U.S. Const., amend. I ..................................................................................... *passim*

**Federal Statutes**

42 U.S.C. § 1981 ......................................................................................................16

**State Statutes**

New York Civil Rights Law

  § 40-C.....................................................................................................................16

New York General Business Law

  § 349.......................................................................................................................16
  § 349(5)...................................................................................................................16
  § 349-a .....................................................................................................................1
  § 349-a(1)(a) ............................................................................................................6
  § 349-a(1)(b) ............................................................................................................6
  § 349-a(1)(d) ..........................................................................................6, 7, 13, 15
  § 349-a(1)(e) ............................................................................................................6
  § 349-a(1)(f) .............................................................................................................6
  § 349-a(2).................................................................................................................6
  § 349-a(3).................................................................................................7, 13, 15
  § 349-a(3)(d) ............................................................................................................9
  § 349-a(4)...........................................................................................................8, 14
  § 349-a(b) .................................................................................................................8
  § 396-r....................................................................................................................16

## INTRODUCTION

New York has enacted a law requiring certain retailers to convey a misleading opinion about the technologies these businesses use to offer discounts to customers. The State is free to express its own (misguided) views about these technologies, but it cannot conscript the businesses that use them—and disagree with the State—into disseminating the State's opinion.

The Algorithmic Pricing Disclosure Act, N.Y. Gen. Bus. Law ("NYGBL") § 349-a, compels an arbitrary class of businesses offering goods or services to New York residents to state that "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA" anytime a covered business uses a computer program to analyze even ordinary, public information shared by a consumer—such as purchase history, items in a shopping cart, or zip code—to display a price. Although the Act appears motivated by concerns about predatory and discriminatory pricing using sensitive data, those practices are already unlawful, and the Act is untethered to that goal or to any evidence suggesting that it solves a real problem.

Laws compelling speech like this are presumptively unconstitutional. To withstand review, the Act must satisfy at least intermediate scrutiny—i.e., it must address a real and significant problem, while regulating no more speech than needed to redress that problem. But the State has *no evidence* that any New York consumer is actually deceived or confused by the way regulated businesses use personal data to set prices, much less offer promotions and discounts. Nor can the State show that the Act regulates no more speech than needed to achieve even that imaginary interest. If the State is concerned about discriminatory pricing or price gouging, those practices are *already* illegal. The solution is to enforce *existing* laws, not to force innocent actors to express a misleading government opinion at war with the facts and their beliefs.

Although the State will argue that the Act survives the less-strict standard of scrutiny articulated in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), that standard does

not apply, and even under the standard, the Act would still be unconstitutional. *Zauderer* applies only to laws that require a speaker to make "purely factual and uncontroversial" disclosures to prevent actual consumer deception. *Id.* at 651. The compelled disclosure here is neither purely factual nor uncontroversial, and is unrelated to preventing any actual deception. And even *Zauderer* requires a compelled disclosure to redress a real, non-hypothetical consumer harm without unduly burdening speech. The Act does neither.

Plaintiff National Retail Federation (NRF) represents members who use the basic technologies covered by the Act to offer discounts and deals to customers. It brings this action to vindicate its members' First Amendment rights "to refrain from speaking" a message the State cannot make them carry. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Because NRF will prevail on the merits and its members will suffer irreparable injuries absent injunctive relief, and because equity and the public interest favor enjoining unconstitutional censorship, NRF respectfully asks the Court to preliminarily enjoin enforcement of the Act.

## RELEVANT BACKGROUND

### A.    NRF Members Use Algorithmic Pricing To Offer Lower Prices.

NRF is the world's largest retail trade association, whose members include discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and internet retailers in more than 45 countries including the United States.

Competitive prices are imperative in the retail sector. NRF members accordingly use data shared by their customers to deliver personalized discounts, promotions, and recommendations. Tailoring promotions to consumers based on their buying habits and other voluntarily disclosed information is nothing new. Grocery and drug stores have long offered coupons at check out for items similar to those purchased; gas stations offer free car washes to certain credit card holders; and coffee shops offer rewards cards giving repeat customers a free coffee every tenth cup. These

targeted promotions help consumers save money and allow retailers to clear their inventory and encourage customers to purchase products they have enjoyed or might enjoy. Declaration of Stephanie A. Martz ("NRF Decl.") ¶¶ 9-19; Declaration of Scott Moller ("Moller Decl.") ¶¶ 3-6; Declaration of Joel Roodman ("Roodman Decl.") ¶¶ 4-6; Declaration of Lisa-Jae Eggert ("Eggert Decl.") ¶ 5; Declaration of Todd Ravinett ("Ravinett Decl.") ¶¶ 5-6.

So-called "algorithmic pricing" permits retailers to offer similar promotions in more sophisticated ways and on a larger scale. Pricing algorithms are computer programs that analyze data. They operate by following instructions developed by humans that reflect human judgments. NRF Decl. ¶ 12. An online retailer seeking to clear inventory of a particular shoe might use an algorithm to set a rule discounting the price of that shoe for customers who have added it to their shopping cart but not purchased it. A brick-and-mortar bookstore might use an algorithm to analyze sales records to determine which customers tend to enjoy political thrillers, and then send those customers an offer to buy a specially priced bundle of novels in that genre. *Id.* ¶ 14. By analyzing customer inputs like purchase history, regional location, and demonstrated interest, pricing algorithms help companies offer promotions, adjust pricing, and reward customer loyalty in ways that would otherwise be difficult to do at scale manually. *Id.* ¶ 12. And while "algorithmic pricing" is sometimes used to refer to impermissible or undesirable pricing discrimination, it also encompasses a large range of industry tools designed to help consumers. *Id.* ¶ 12; *see also* Declaration of Adam S. Sieff ("Sieff Decl.") Ex. 1 at 9–10, 17–23.

Importantly, algorithmic pricing in the aggregate lowers overall prices. Studies have consistently shown that algorithmic pricing incorporating data on market conditions plays a powerful role in driving down prices for consumers because algorithms allow companies to be more responsive to supply and demand and to optimize pricing to reflect market conditions. Sieff

3

Decl. Ex. 2 at 3–4, 30–36; Ex. 3 at 22–30, 37; Ex. 4 at 391–92.  Online coupons, for example, provide significant annual savings to American households.  *Id.* Ex. 5.

      Many large online retailers, for example, use non-sensitive customer data to deliver personalized deals, discounts, and shopping experiences to customers, adapting longstanding retail practices to the 21st century.  *See* NRF Decl. ¶ 11.  A retailer can offer discounts, coupons, or "Buy X, Get Y" promotions to customers who have an item in their cart for a certain number of days, who have viewed multiple products made by a particular brand, or who have a history of buying the same item.  *Id.* ¶¶ 10, 16.  These promotions—customized based on ordinary data about customers' purchasing habits or product preferences—allow retailers to deliver the best prices to customers for goods tailored to those customers' demonstrated interests.  *Id.* ¶ 16.

      Many smaller retailers, across not only New York but the rest of the country, also offer customized consumer discounts that amount to "algorithmic pricing."  NRF member 3 Moms Organic LLC, for example, is a small East Hampton-based business that sells all-natural insect repellent, and has grown from selling only at local fairs and farmers markets to selling online, through its own website and through other retail platforms.  *See* Eggert Decl. ¶¶ 1-3.  It offers "cart abandonment" discounts to customers who have saved its products to their cart but did not complete the purchase.  *Id.* ¶ 5.

      NRF member Logic Product Group LLC, a New York City-based business that makes eco-friendly haircare products such as non-toxic shampoos for kids and for lice removal, likewise sells both through its own website and through third-party e-commerce platforms.  *See* Roodman Decl. ¶¶ 1-3.  It offers varied personalized customer discounts—for example, to encourage a customer who has bought a lice *treatment* product through its website to consider purchasing a lice *prevention* product; or simply to incentivize someone who has visited the website without making

a purchase to close a transaction.  *See id.* ¶¶ 4, 6.

AmeriBag Products LLC, another NRF member, is a second-generation family business founded in Kingston, NY, that manufactures backpacks, handbags, and shoulder slings designed to distribute weight ergonomically and reduce neck, back, and shoulder stress.  Ravinett Decl. ¶¶ 2-3.  It too sells its products largely online, through its own website and third-party e-commerce platforms.  *Id.* ¶ 4.  AmeriBag, too, uses a third-party vendor to facilitate offering cart abandonment discounts.  *Id.* ¶ 5.

Grill Sergeant, also an NRF member, is a Nebraska-based small business that sells grilling and smoking products through its website and through e-commerce platforms.  Moller Decl. ¶¶ 1-2.  It too offers "cart abandonment" discounts through its own website, as well as discounts to e-commerce shoppers who have added Grill Sergeant products to their "watch" lists, have purchased Grill Sergeant products, or have added them to their carts.  *Id.* ¶¶ 3, 5-6.

Importantly, none of these businesses collects sensitive data such as race, gender, age, or income information.  *See* Eggert Decl. ¶ 4; Roodman Decl. ¶ 5; Ravinett Decl. ¶ 5; Moller Decl. ¶ 7.  And none of them uses consumer information to *increase* prices.  *See* Eggert Decl. ¶ 6; Roodman Decl. ¶ 7; Ravinett Decl. ¶ 6; Moller Decl. ¶ 8.  To the contrary, many retailers are appalled by such business practices and would never want to imply to their customers that they have adopted them.  *See, e.g.*, Eggert Decl. ¶¶ 6, 8-9; Ravinett Decl. ¶¶ 7, 9-10.

### B.    New York Forces NRF Members To Express Misleading Views About Algorithmic Pricing.

New York Governor Kathleen Hochul signed the Act into law on May 9, 2025.

***Compelled Disclosure.***  The Act requires covered retailers who advertise to New York consumers to place a conspicuous, consumer-facing disclosure next to all qualifying products and services stating: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL

5

DATA." NYGBL § 349-a(2). The mandate applies not just to portions of product listings displaying a list price, but arguably even to compact banner ads, tiny thumbnails, and any notification, alert, pop-up, or other display that shows a product and a price. *Id*.

*Scope*. The Act sweeps broadly, but is simultaneously replete with arbitrary exemptions. It generally applies to any "entity that sets the price of a specific good or service using personalized algorithmic pricing" and that "directly or indirectly advertises, promotes, labels or publishes" that price to a New York consumer "using personal data specific to such consumer." *Id*. It requires that the disclosure appear alongside the published price of all goods or services generated using algorithmic pricing, in a "clear and conspicuous" format. *Id*. "Clear and conspicuous" means that the disclosure must appear "in the same medium as, and provided on, at, or near and contemporaneous with every" display or announcement of the price, "using lettering and wording that is easily visible and understandable to the average consumer." *Id*. § 349-a(1)(b).

The Act reaches a range of garden-variety pricing practices. "Personalized algorithmic pricing" means "dynamic pricing set by an algorithm that uses personal data." *Id*. § 349-a(1)(f). "Algorithm" is any "computational automated process" using rules to define operations. *Id*. § 349-a(1)(a). "Personal data" encompasses any information that "identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device." *Id*. § 349-a(1)(d). "Dynamic pricing" refers to pricing that "fluctuates depending on conditions." *Id*. § 349-a(1)(e).

At the same time, the Act exempts four categories that seemingly bear no logical connection to each other or the Act's ostensible purpose: prices displayed for (i) local delivery, ride-share, and taxi services that use location data (but no other kind of data) to calculate trip pricing, (ii) consumer insurance products, (iii) consumer financial products and services sold by most banks, trust companies, credit unions, savings and loan associations, and industrial loan

companies, and (iv) goods sold under a subscription-based agreement, if the price displayed is "less than the price for the same good or service set forth in the subscription-based agreement." NYGBL §§ 349-a(1)(d), (3). The Act contains no reason for treating these categories any differently from others.

*Legislative History.* The Act's legislative history is sparse. The Act was passed less than two months after its introduction with little deliberation, no fact finding, and following an incomplete study abandoned by the Federal Trade Commission (FTC).[1] That study, terminated less than six months after it began, resulted in the unprecedented publication of "initial observations" and "research summaries" over the dissent of two FTC Commissioners.[2] The summaries, which the FTC admits are incomplete, contain nothing to suggest consumers are deceived, confused, misled, or harmed by algorithmic pricing. And as both the FTC and New York State legislators have acknowledged, the report left "more work" and research to be done before reaching any firm conclusions.[3] The State nevertheless appears to have relied on the FTC's

---

[1] *See* Sieff Decl. Ex. 6, Andrew N. Ferguson, Comm'r, Fed. Trade Comm'n, *Concurring Statement regarding Surveillance Pricing Intermediaries, Matter No. P246202* (July 23, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/surveillance-pricing-6b-ferguson-concurrence.pdf; *see id.* Ex. 7, Melissa Holyoak, Comm'r, Fed. Trade Comm'n, *Concurring Statement regarding Surveillance Pricing Intermediaries, Matter No. P246202* (July 23, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/holyoak-concurring-statement-re-surveillance-pricing.pdf.

[2] *See* Sieff Decl. Ex. 8, Fed. Trade Comm'n, *FTC Surveillance Pricing 6(b) Study: Research Summaries; A Staff Perspective* (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/p246202_surveillancepricing6bstudy_researchsummaries_redacted.pdf; *see id.* Ex. 9, Fed. Trade Comm'n, *Dissenting Statement of Commissioner Andrew N. Ferguson Joined by Commissioner Melissa Holyoak Regarding the Surveillance Pricing 6(b) Staff Research Summaries*, *Matter No. P246202* (Jan. 17, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/surveillance-pricing-6b-research-summaries-ferguson-dissent-final.pdf.

[3] *See* Sieff Decl. Ex. 10, Alfred Ng, *The fight over unfair pricing goes national*, Politico (May 28, 2025), https://www.politico.com/news/2025/05/28/trump-surveillance-pricing-00370566.

incomplete efforts to pass the Act.[4]  Nothing in the Act itself or the legislative record provides evidence that the Act addresses any real consumer injuries.  The Act makes no findings, the legislature held no substantive hearings, and there is thus no legislative record to substantiate the Act's apparent assumptions.

*Enforcement.*  The Act takes effect July 8, 2025.  *See* S.B. 3008, ch. 58, pt. X § 1, 248th Leg. Reg. Sess. (N.Y. 2025).  Only the New York Attorney General may enforce the Act. *See* NYGBL § 349-a(4).  The Attorney General must first send a cease-and-desist letter identifying alleged violations, and if the target does not cure them within the timeframe she sets, she may seek injunctive relief and penalties of up to $1,000 per violation.  *Id*.  A single product displayed to just 1,000 customers without the disclosure exposes a business to a $1 million penalty.

## C.    The Act Irreparably Harms NRF Members And Their Consumers.

Absent an injunction, NRF members will be forced to endorse a baseless government opinion at war with their own convictions, misrepresent their actual practices, risk losing consumer trust, and incur non-recoverable and ongoing compliance costs.

The Act's requirements are far-ranging and onerous.  Because retailers' pricing algorithms use information voluntarily shared by their customers, the Act will apply to most, if not all, products they sell.  And because the Act requires that the mandated disclosure be provided "contemporaneous with every advertisement, display, image, offer, or announcement of a price," NYGBL § 349-a(b), it likely will require retailers to place the warning not only on product pages and mobile apps, but also on search result pages, on "suggested product" pages, in the customer's cart, and on advertisements for products hosted on third-party websites, including non-retail websites.  NRF Decl. ¶ 20; *see also* Moller Decl. ¶ 12; Roodman Decl. ¶ 9; Eggert Decl. ¶ 8;

---

[4] *Id*.

Ravinett Decl. ¶ 9. Ensuring this disclosure appears for millions of New York customers, for countless products and in a wide array of places, both on and off a retailer's platform, will be costly. NRF Decl. ¶ 21. And because the Act applies only to New York consumers, NRF members will have to develop technology to create a virtual boundary around New York to determine to whom it needs to publish the disclosure. *Id.*; *cf.* Roodman ¶ 13 (noting complexities and limitations of geofencing); Moller ¶¶ 14-16 (noting burden of implementing geofence).

The Act also applies to discounts offered to members of NRF retailers' price and loyalty clubs. Although the Act includes an exception for prices offered to consumers based on subscriptions, the exception encompasses only discounted prices for goods or services that are "set forth in the subscription based agreement or subscription based contract." NYGBL § 349-a(3)(d). Retailers' loyalty member agreements, however, do not always set forth specific static prices or discounts before sale. NRF Decl. ¶ 22. Offering discounts to members of such programs would thus likely require the mandated disclosure.

NRF members reasonably fear that the mandated disclosure required by the Act will mislead consumers about the type of data NRF members use to calculate prices and the effect of personal data on product prices. First, upon seeing the disclosure, consumers will naturally but falsely conclude that an NRF member relied on sensitive personal information (*e.g.*, age, gender, race, credit score, income level, specific geolocation) in setting the price. NRF Decl. ¶ 23; Moller Decl. ¶ 12; Roodman Decl. ¶ 9; Eggert Decl. ¶ 8; Ravinett Decl. ¶ 8. Second, consumers will naturally but again falsely conclude that the NRF member used this information to *increase* the price offered. NRF Decl. ¶ 23; Moller Decl. ¶ 12; Roodman Decl. ¶ 9. These misconceptions will result not only from the imprecise, limited, and decontextualized nature of the disclosure but also from popular media and politicians' misunderstanding of garden-variety processing algorithms

and misrepresenting their risks—undermining the hard-earned trust that consumers place in NRF retailers like 3 Moms Organic, Grill Sergeant, Logic Products, and Ameribag.

The Act will also require removal of NRF members' own speech. The pixel space on any given online product page is valuable real estate. The length and size of the "conspicuous" mandated disclosure means that retailers will have to surrender a significant amount of that space. NRF Decl. ¶ 26. And because the Act requires that the disclosure be provided "contemporaneous with every advertisement, display, image, offer, or announcement of a price," NRF members will likely need to place these disclosures not only on product pages, but also on search result pages, "suggested product" pages, the customer's shopping cart, and ads on third-party websites. *Id.*

Above all, the Act will force covered businesses to express an opinion about how their business operates even if they fundamentally disagree with it, and even if they believe it will mislead and confuse their customers. NRF Decl. ¶ 28; Moller Decl. ¶¶ 11-12, 16; Roodman Decl. ¶¶ 9-11, 14; Eggert Decl. ¶¶ 8-10; Ravinett Decl. ¶¶ 9-11. Even putting aside the effects of that message on NRF members' customers, being forced to speak the Government's message will injure NRF members who disagree with that message. *Id.*

## LEGAL STANDARD

A preliminary injunction is warranted where a plaintiff demonstrates a likelihood of success on the merits and a threat of irreparable harm absent relief. *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010). Courts also consider whether equity tips in the plaintiff's favor, and whether the public interest favors an injunction. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020). Where, as here, the government is a party to the lawsuit, the equity and public interest factors "merge." *Id.* at 58–59.

## ARGUMENT

A preliminary injunction is warranted here. NRF is likely to prevail on its First Amendment claim, regardless what level of scrutiny the Court applies to it; its members will suffer irreparable injury absent an injunction; and the remaining injunction factors support relief.

## I.    NRF Is Likely To Prevail On Its First Amendment Claim.

"[T]he government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). Laws that compel speech are "presumptively unconstitutional" because they necessarily change the content of free expression. *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citations omitted). These protections apply to commercial speech because "[t]he right not to speak inheres in political and commercial speech alike." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) "The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (quotation omitted). A law thus implicates the First Amendment where it requires commercial speakers to endorse "speech with which they disagree." *Id.* at 411 (government could not compel business to subsidize advertising it opposed). That includes laws regulating how sellers may communicate their prices. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017).

The Act violates these principles. Strict scrutiny should apply because the Act arbitrarily singles out some commercial speakers for "differential treatment" based on the subject matter of their advertisements. *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015).[5]  But even under the

---

[5] Although the Act is likely not subject to strict scrutiny under Second Circuit precedent, *see, e.g.*, *Citizens United v. Schneiderman*, 882 F.3d 374, 382 (2d Cir. 2018), NRF preserves its argument that strict scrutiny should apply here. Justice Thomas, for instance, has repeatedly questioned the premise that laws compelling commercial speech based on its content should be evaluated under a less-searching standard. *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 751 (2024) (Thomas,

traditional intermediate scrutiny test for commercial speech from *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557 (1980), the Act cannot stand.  And while the State may argue the less-stringent *Zauderer* test applies, that test neither applies nor is satisfied here.

### A.    The Act Fails Intermediate Scrutiny.

Whether strict or intermediate scrutiny, the Act is subject to heightened review because it singles out a class of speakers for differential treatment based on the subject matter of their speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–66, 571 (2011) (applying "heightened scrutiny" to invalidate law imposing "content-and-speaker-based restrictions" on commercial speech).  This principle applies equally to commercial speech, *id.* at 566, because "[t]he vice of content-based legislation" is that it can be used for censorship in every case.  *Reed*, 576, U.S. at 167 (expressing concern that "government officials may one day wield such statutes to suppress disfavored speech") (quotation omitted); *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425 n.20, 429 (1993) (explaining that "disparate treatment of two types of commercial speech" is

---

J., concurring in the judgment) (encouraging Court "to reconsider" framework for evaluating compelled disclosures); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and in the judgment) (questioning the "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech").

Application of strict scrutiny finds support in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–90, 391–92 (1992), which held that even regulations of *unprotected* speech trigger strict scrutiny when they make arbitrary content-based distinctions *within* those categories of speech (i.e., penalizing fighting words attacking Catholics but not Protestants, to use Justice Scalia's memorable example).  Although *R.A.V.* acknowledged that the government "may choose to regulate price advertising in one industry but not in others" without satisfying strict scrutiny when it can demonstrate that "the risk of fraud is greater" in that industry, it made clear such a distinction must be principled.  *Id.* at 388–89 (explaining that arbitrarily prohibiting "only that commercial advertising that depicts men" but not women "in a demeaning fashion," for example, would be subject to strict scrutiny).  If arbitrarily discriminating within *unprotected* categories of speech triggers strict scrutiny, arbitrarily discriminating within a protected class of commercial speech should do the same.  *See also Zauderer*, 471 U.S. at 661 (Brennan, J., concurring) (emphasizing it was important to "guard against impermissible discrimination among different categories of commercial speech").

governed by at least intermediate scrutiny).  Thus in *Sorrell*, the Supreme Court held that *at least* intermediate scrutiny applied to a Vermont law barring pharmacies from publishing information to drugmakers for marketing purposes, when that law exempted dissemination for other purposes to other recipients.  564 U.S. at 563–64.

The Act exempts advertisements from certain industries—including those selling insurance, financial services, some ride-hailing services, as well as retailers offering particular kinds of memberships that use preset prices, NYGBL §§ 349-a(1)(d), (3)—even though the State's (baseless) concerns would logically apply equally to their advertising.  "[S]ingl[ing] out" just those retailers whose advertisements *do not* contain subject matter involving these services "favors speech made for" some purposes over others and renders the Act "a content-based restriction on speech."  *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618–19, 620 (2020) (law exempting robocalls from regulation depending on speaker and message was content-based) (applying *Reed*, 576, U.S. at 169).  Even if the government harbors no animosity toward retailers covered by the Act, heightened scrutiny applies since the State's "[i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based statute."  *Reed*, 576 U.S. at 167; *see also Discovery Network*, 507 U.S. at 429 (rejecting the argument that "'discriminatory … treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas'") (quoting *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991)).

The State cannot carry its burden under heightened scrutiny, even under the intermediate scrutiny standard from *Central Hudson*.  That test requires the State to prove the Act (1) actually and directly advances a real, non-speculative, and substantial state interest, and (2) regulates no more speech than necessary to achieve that end.  *See IMS Health Inc. v. Sorrell*, 630 F.3d 263,

275, 276–77 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011).  The Act fails both prongs.

     ***No substantial interest.***  The Act fails to directly advance a substantial interest for two principal reasons.  *First*, the State has no evidence the Act addresses any real consumer injuries.  The Act contains no findings, the legislature held no substantive hearings, and there is accordingly no legislative record to substantiate the Act's apparent assumptions.  *Cf. United States v. Virginia*, 518 U.S. 515, 516 (1996) (law's justification "must be genuine, not hypothesized or invented post hoc in response to litigation").  The FTC's truncated 2024 research, found nothing to suggest consumers were deceived, confused, misled, or harmed by algorithmic pricing.  *Cf.* Sieff Decl. Ex. 8.  And independent, peer-reviewed studies confirm that price-setting algorithms generally benefit consumers in the aggregate by increasing market efficiency, lowering prices, increasing output, and decreasing companies' abilities to collude.  *See, e.g.*, Sieff Decl. Ex. 1 at 9–10, 17–23; Ex. 2 at 3–4, 30–36, 39; Ex. 3 at 3, 22–30, 37; Ex. 4 at 391–92; Ex. 11 at 653–54.  That is also NRF members' experience.  *See* NRF Decl. ¶¶ 9-13, 18-19; Moller Decl. ¶¶ 3-6, 8; Roodman Decl. ¶¶4-7; Eggert Decl. ¶ 5; Ravinett Decl. ¶¶ 4-6 (explaining that algorithmic pricing enables them to offer deals and discounts).  In fact, the Act expressly authorizes penalties for retailers who don't publish the State's warning even without "proof that any person has, in fact, been injured or damaged," conceding the Act's enforcement *may never* advance any real consumer protection interest.  NYGBL § 349-a(4).  And to the extent the State nakedly asserts that consumers *could be* injured by algorithmic pricing, that is "too speculative to qualify as a substantial state interest under *Central Hudson*."  *IMS Health*, 630 F.3d at 276 (asserted interest in medical privacy failed absent evidence that doctors actually perceived the harm the legislature assumed); *see also, e.g.*, *DoorDash, Inc. v. City of N.Y.*, 750 F. Supp. 3d 285, 305 (S.D.N.Y. 2024) (commercial speech regulation failed review absent evidence it was needed to combat any consumer exploitation).

Without evidence demonstrating a need for disclosure, the Act fails. *See Int'l Dairy Foods Ass'n*, 92 F.3d at 74 (compelled disclosure failed review absent "indication that this information bears on a reasonable concern").

 *Second*, even if the Act addressed any real consumer harms, it does not redress them. To begin with, there is no evidence that inundating consumers with flurries of identical warnings will actually provide any useful information. *See Edenfield v. Fane*, 507 U.S. 761, 774 (1993) (commercial speech regulations must be shown to be "effective"). Worse, the Act contains unprincipled exceptions that would permit the asserted harms in a significant—and if the harms were real, presumably important—range of uncovered applications. *See* NYGBL §§ 349-a(1)(d), (3). Legislation seriously concerned with the abuse of sensitive personal data would not exempt classes of businesses—like banks and insurance companies—*especially likely* to collect and potentially misuse such data. A regulation that exempts important sources of the putative problem the government burdens speech to avert does not "materially advance its aim." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (regulating labels on some alcoholic beverages but not others failed intermediate scrutiny); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999) (regulating some casino advertisements but not others was "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it"). When the government exempts some speech from regulation, it must demonstrate a rational connection between the exempted speech and the government's goals. *See Discovery Network*, 507 U.S. at 418–19 (banning news racks for commercial handbills but not newspapers was irrational and would yield "minimal impact"). The State cannot.

 ***No narrow tailoring.*** The Act also fails intermediate scrutiny because it is overinclusive. The Act defines algorithmic pricing so generally and vaguely that it encompasses the many typical,

consumer-friendly discounting practices described above.  *See* NRF Decl. ¶¶ 9-13, 15-19; Moller

Decl. ¶¶ 3-6, 8; Roodman Decl. ¶¶ 4-7; Eggert Decl. ¶ 5; Ravinett Decl. ¶¶ 4-7.  Evidence thus

shows that algorithmic pricing generally yields lower prices and efficiencies that enhance

consumer welfare.  *See* Sieff Decl. Ex. 1 at 9–10, 17–23; Ex. 2 at 3–4, 30–36, 39; Ex. 3 at 3, 22–

30, 37; Ex. 4 at 391–92; Ex. 11 at 653–54; NRF Decl. ¶¶ 9-13, 18-19.  But the Act's compelled

disclosure nonetheless must appear near pricing information, whether or not a customer receives

a lower price for the good or service desired.

    If the State is concerned covered businesses could leverage algorithmic pricing to price

gouge consumers or discriminate by overcharging protected classes, Sieff Decl. Ex. 12 (Governor

Hochul's signing statement), Ex. 13 (Assemblymember Torres's statement), the State has failed to

show that "less speech-restrictive approaches would [not] sufficiently promote the asserted

government interests."  *IMS Health*, 630 F.3d at 280–82.  Existing law provides obvious less

restrictive alternatives.  New York *already prohibits* illegal discrimination, price gouging, and

unfair business practices.  *See, e.g.*, N.Y. Civ. Rights Law § 40-C (discrimination); NYGBL § 396-

r (price gouging); NYGBL § 349 (unfair business practices).  Federal law also prohibits businesses

from imposing discriminatory terms on transactions.  *See* 42 U.S.C. § 1981.  The Act *itself* enacts

another regulation prohibiting algorithmic price gouging.  *See* NYGBL § 349(5).  And regulators

may use any number of existing consumer protection laws to redress exactly the type of harm that

appears to have animated the legislation.  A regulation restricts more speech than necessary when

"the State may vigorously enforce" existing law to address its concerns.  *Riley v. Nat'l Fed'n of

the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988) (compelled speech regulation failed review for

this reason); *see also, e.g.*, *N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 844 (2d Cir.

1994) (law failed intermediate scrutiny because government failed to demonstrate inadequacy of

alternatives).  The existence of these alternatives is fatal, as well.  *See IMS Health*, 630 F.3d at 280 (availability of "more direct, less speech-restrictive means" was dispositive).

## B.    The *Zauderer* Standard Does Not Save The Act.

The State may claim the Act is permissible under the less stringent standard from *Zauderer*. The Supreme Court has held that the *Zauderer* standard applies to "purely factual and uncontroversial" disclosures aimed at preventing consumer deception.  471 U.S. at 651.  That is not what the Act regulates, and thus *Zauderer* does not apply here.  But even if *Zauderer* applies, the Act does not survive scrutiny because it is not justified and is unduly burdensome.

### 1.    The *Zauderer* standard does not apply.

*Zauderer* applies only to regulations of deceptive advertising, where the government requires the publication of "purely factual" and "uncontroversial" corrective disclosures.  471 U.S. at 651.  None of those circumstances exists here.

### a.    The Act bears no relationship to deceptive advertising.

*Zauderer*'s modified standard applies only to regulations of *deceptive* advertising—that is, if a required disclosure is needed "to dissipate the possibility of consumer confusion or deception." *Id.* (quotation omitted).  Departure from stricter scrutiny is thus warranted only "'as long as disclosure requirements are reasonably related to … preventing deception of consumers.'" *CompassCare v. Hochul*, 125 F.4th 49, 64 (2d Cir. 2025) (quoting *Zauderer*, 471 U.S. at 651); *see also In re R.M.J.*, 455 U.S. 191, 203, 206 (1982) (pre-*Zauderer* decision holding that intermediate scrutiny applies to commercial speech that is not misleading).  The Supreme Court reaffirmed this bedrock requirement in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010), holding that *Zauderer* applies only to mitigate commercial speech with "'a tendency to mislead.'"  It did so again in *NIFLA*, 585 U.S. at 768, explaining that *Zauderer* was predicated on concern that lawyers advertising contingency-fees would mislead clients about their ultimate

responsibility "to pay some fees."

Nothing here compares. Listing a price that happens to be set by an algorithm, without more, does not misrepresent or withhold facts about "the terms under which [any] services will be available." *Zauderer*, 471 U.S. at 651. The price shown *is* the price charged. This analysis might differ if the Act targeted businesses that make representations about *how* they set their prices, *Braynina v. TJX Companies, Inc.*, 2016 WL 5374134, at *9 (S.D.N.Y. Sept. 26, 2016) (plaintiff plausibly alleged deception where retailer misrepresented that its list price was lower than competitors' prices), or that withhold information that the price displayed may not be the *actual* price charged, *Zauderer*, 471 U.S. at 650 (lawyers failed to disclose that contingency arrangement did not cover all costs). But the Act does not work that way.

At bottom, there is nothing misleading about the fact that a price is set using an algorithm that processes a series of data inputs. It is no different than the fact that the price of eggs at a grocery store is set according to a variety of factors—the store's contracts with distributors; the cost of labor and rent; market conditions for eggs generally; the price at the grocery store up the block—never disclosed to consumers. Because nothing about the Act corrects misleading commercial speech—and indeed because the Act burdens NRF members' own abilities to share accurate information about their discount programs, NRF Decl. ¶ 26—the Act "does not serve the public informational interest that animated *Zauderer*." *DoorDash, Inc.*, 750 F. Supp. 3d at 302.

### b.    The compelled message is not "purely factual."

*Zauderer* only applies to requirements to publish "purely factual" disclosures. *NIFLA*, 585 U.S. at 768–69 (citing *Zauderer*, 471 U.S. at 651). A statement is not "purely factual" where it is "literally true but nonetheless misleading and, in that sense, untrue." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023) (quotation omitted); *see also Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 528–29 & 529 n.28 (D.C. Cir. 2015) (sometimes "the surest way to convey

18

misinformation is to tell the strict truth") (quotation omitted).  For example, warnings may be misleading and thus not purely factual if "the totality of the warning" misleadingly implies that a consumer product or service is dangerous.  *Wheat Growers*, 85 F.4th at 1279; *see also, e.g.*, *Cal. Chamber of Com. v. Bonta*, --- F. Supp. 3d ----, 2025 WL 1284779, at \*9 (E.D. Cal. May 2, 2025) (courts must "consider the overall impression delivered by a compelled warning").

The Act's compelled disclosure does not qualify for *Zauderer* review because its "overall message" gives the misleading, imaginary, and "unsubstantiated" impression that price-setting algorithms are "dangerous."  *Wheat Growers*, 85 F.4th at 1277, 1279.  That position—which also undermines and burdens retailers' abilities to provide their own truthful communications about their discount programs—is unsupportable, given that in the *overwhelming* majority of situations, algorithmic pricing results in lower prices.  *See* Sieff Decl. Ex. 1 at 9–10, 17–23; Ex. 2 at 3–4, 30–36, 39; Ex. 3 at 3, 22–30, 37; Ex. 4 at 391–92; Ex. 11 at 653–54; NRF Decl. ¶¶ 9-13, 19, 23.  It is at best a matter of opinion, and one that NRF and its members do not share.  *See Kimberly-Clark Corp. v. D.C.*, 286 F. Supp. 3d 128, 141 (D.D.C. 2017) (statement not purely factual if it "come[s] across as a matter of opinion").  The undefined term "personal data" evokes consumer concerns about non-consensual invasive surveillance, even though the law defines it to include innocuous information like zip codes or loyalty program status that consumers choose to share.  *See Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022) (compelled disclosure misleading because its vague terms could generate unsubstantiated inferences about product's dangers).  Coupled with "algorithm," the message falsely implies that a price is exploitative, even in the vast majority of cases where algorithmic price-setting *benefits* the customer.  Sieff Decl., Ex. 1, Ex. 2, Ex. 3, Ex. 4, Ex. 11.  Public distrust and misunderstanding of algorithms—as reported in the media and cited by policymakers to regulate their use—amplify

this concern.  Sieff Decl. Ex. 14.

A similar problem arose in *R.J. Reynolds Tobacco Co. v. F.D.A.*, 845 F. Supp. 2d 266 (D.D.C. 2012), where compelling cigarette makers to publish graphic images of real smokers was not "purely factual"—even though literally true—because the disclosures "evok[ed] a strong emotional response" that effectively expressed an opinion.  *Id.* at 272.  So too here.  A consumer encountering the government-mandated warning will naturally conclude that retailers are placing them in danger—why else compel the disclosure?  Because that impression is false, the disclosure is not purely factual.  *See Wheat Growers*, 85 F.4th at 1277, 1279.

### c.     The compelled message is controversial.

*Zauderer* also only applies when a compelled disclosure is "uncontroversial."  *NIFLA*, 585 U.S. at 769 (citing *Zauderer*, 471 U.S. at 651).  A message is controversial if it forces the speaker to take sides in a public debate.  Thus in *NIFLA*, the Supreme Court declined to apply *Zauderer* when the compelled disclosure "took sides in a heated political controversy," forcing a covered business "to convey a message fundamentally at odds with its mission," *CTIA v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019).

That is the case here.  Technological developments in machine learning, algorithms, and artificial intelligence are changing the ways Americans live, work, shop, learn, interact, and participate in our democracy, and the nation is engaged in a robust debate about whether these technologies should be regulated.  *See generally Moody v. NetChoice LLC*, 603 U.S. 707 (2024).  Against this backdrop, requiring businesses that develop or use these technologies, which they believe are socially beneficial, to tell customers that pricing is determined by an algorithm that uses "your personal data"—without the ability to modify that statement to provide context—forces those businesses to credit an insinuation at war with their beliefs.  *See Wheat Growers*, 85 F.4th at 1277.  It also undermines trust and brand identity and contradicts corporate messaging focused on

customer-centric practices derived from the use of these technologies.  NRF Decl. ¶ 28; Roodman

Decl. ¶¶ 4-7, 9-11, 14, Eggert Decl. ¶¶ 5-6, 8; Moller Decl. ¶¶ 3-4, 6, 8, 10-12, 16.

That the disclosure requires retailers to implicitly inculpate themselves in wrongdoing

compounds the problem.  *See Nat'l Ass'n of Mfrs.*, 800 F.3d at 530 (requiring a business to

condemn itself makes a compelled disclosure "more constitutionally offensive").  So does the fact

that research and evaluation of algorithmic pricing is still developing, Sieff Decl. Exs. 8, 9, though

the research to date suggests that such pricing is overwhelmingly consumer-positive.  *Id.* at Ex. 1

at 9–10, 17–23; Ex. 2 at 3–4, 30–36, 39; Ex. 3 at 3, 22–30, 37; Ex. 4 at 391–92; Ex. 11 at 653–54.

"[T]he fact that science is evolving is all the more reason to provide robust First Amendment

protections" beyond what *Zauderer* provides.  *Wheat Growers*, 85 F.4th at 1283.

### 2.    The Act also fails under the *Zauderer* standard.

It ultimately makes no difference whether the Court applies *Zauderer* or stricter scrutiny.

"Even under *Zauderer*," the government "has the burden to prove" that a disclosure requirement

is not "'unjustified or unduly burdensome.'"  *NIFLA*, 585 U.S. at 776 (quoting *Zauderer*, 471 U.S.

at 651).[6]  The State cannot carry that burden.

### a.    The Act's disclosure requirement is unjustified.

Just as it must under intermediate scrutiny, the government must show under *Zauderer* that

the compelled disclosure will "remedy a harm that is potentially real, not purely hypothetical."

*See NIFLA*, 585 U.S. at 776-77 (quotation omitted).  "'[P]rophylactic rules'" are not enough.  *Id.*

(citation omitted).  Nor are unsubstantiated claims that the public *may* be misled.  *See Int'l Dairy*

*Foods Ass'n*, 92 F.3d at 73.  Mere "consumer curiosity" is also insufficient "to sustain the

---

[6] Although the Second Circuit likened the *Zauderer* analysis to rational basis review in
*CompassCare*, 125 F. 4th at 65, that *dictum* is at odds with Supreme Court precedent from *NIFLA*,
and even the *CompassCare* court did not use a rational basis test to evaluate the law at issue.

compulsion of even an accurate, factual statement" absent proof of real cognizable harms.  *Id.* at 74 (disclosure would have failed *Zauderer*).  Thus in *NIFLA*, the Court held that another required disclosure—that unlicensed crisis pregnancy centers disclose that they are unlicensed—"point[ed] to nothing suggesting that pregnant women do not already know that the covered facilities are staffed by unlicensed medical professionals."  585 U.S. at 777; *see also, e.g.*, *Ibanez v. Fla. Dep't of Bus. & Prof. Regul. Bd. of Accountancy*, 512 U.S. 136, 145 (1994) (invalidating law requiring certified financial planners to disclose that they were accredited by a private organization because there was no evidence the public might otherwise be harmed).

The Act's concern with non-existent and never-proven consumer injury is dispositive under *Zauderer*.  The State appears driven by abstract transparency goals untethered from any real existing harm from algorithmic pricing, much less evidence of actual deception.  *See supra* § I.A (same defect fatal under intermediate scrutiny).  The developed evidence indicates the opposite. Sieff Decl. Ex. 1 at 9–10, 17–23; Ex. 2 at 3–4, 30–36, 39; Ex. 3 at 3, 22–30, 37; Ex. 4 at 391–92; Ex. 11 at 653–54.  And the FTC found no harm despite several months of searching.  *Id.* Exs. 8, 9.  New York cannot compel commercial speech prophylactically, *NIFLA*, 585 U.S. at 776, in the hopes that a justification materializes down the road.  *Cf. IMDb.com, Inc. v. Becerra*, 257 F. Supp. 3d 1099, 1102 (N.D. Cal. 2017) (government may not "go fishing for a justification" after "having failed to present any colorable argument or evidence in support of the notion that its speech restriction is actually necessary"), *aff'd,* 962 F.3d 1111 (9th Cir. 2020).

### b.    The Act's disclosure requirement is unduly burdensome.

The *Zauderer* standard departs from intermediate scrutiny *only* in softening the narrow tailoring requirement to an "unduly burdensome" standard.  *See NIFLA*, 585 U.S. at 776, 777–78. But even that test has bite the Act cannot escape.  A compelled commercial disclosure is unduly burdensome and not narrowly tailored if it extends "broader than reasonably necessary," "drowns

out" a covered speaker's own message, or targets a "curiously narrow subset of speakers" in a way that makes a compelled disclosure "wholly disconnected from" a regulator's "informational interest." *Id.* at 776–78.

The Act is guilty of all three. The law is broader than necessary because it compels a damning warning "no matter what," *id.* at 777, even when—as in the majority of demonstrated cases, Sieff Decl. Ex. 1 at 9–10, 17–23; Ex. 2 at 3–4, 30–36, 39; Ex. 3 at 3, 22–30, 37; Ex. 4 at 391–92; Ex. 11 at 653–54; NRF Decl. ¶¶ 9-13, 19, 23; Moller Decl. ¶¶ 3-8; Roodman Decl. ¶¶ 4-7; Eggert Decl. ¶ 5; Ravinett Decl. ¶¶ 4-6—algorithmic pricing provides *lower* prices or other consumer benefits. The law also tends to displace covered speakers' own speech because fitting an 11-word, conspicuous warning adjacent to a four- or five-digit price into millions of tiny and crowded product listing pages, product thumbnails, "glance view" tabs, and banner ads is infeasible and functionally requires removing other information that retailers wish to provide. NRF Decl. ¶ 26; Moller Decl. ¶ 18. And the law is simultaneously fatally *underinclusive* because it targets an arbitrary subset of speakers based on the content of their speech, indicating by its exemptions a significant disconnect from the State's asserted consumer protection interest: the State cannot possibly explain why the putative dangers of algorithmic pricing warrant a disclosure in online grocery stores, but not banks, credit unions, brokerage firms, insurance companies, or ride-hailing services, "even though the latter [are] no less likely" to present the risks the government claims. *NIFLA*, 585 U.S. at 777; *see supra* § I.A (discussing *Rubin*, 514 U.S. at 489 and *Greater New Orleans Broad.*, 527 U.S. at 193).

\* \* \* \* \*

The Act cannot be justified under any standard of First Amendment review. NRF is accordingly likely to prevail on the merits of its First Amendment claim.

C.      **The Court Should Grant Facial Relief**

Although facial relief ordinarily requires a plaintiff to show that *all* of a challenged regulation's applications are unconstitutional (*i.e.*, that it has no permissible sweep), facial challenges under the First Amendment are subject to a "less demanding" standard to "provide breathing room for free expression."  *Moody*, 603 U.S. at 723 (citing cases).  A regulation is facially invalid under the First Amendment if even "a substantial number of [its] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Id.* (quotation omitted).

The Supreme Court has described this longstanding test as a two-step process.  Courts first determine a challenged law's "full range of applications" (*i.e.*, does it regulate speech in some, most, or all cases).  *Id.* at 726.  They next decide which of the laws' applications to speech "violate the First Amendment," and compare the unconstitutional and unconstitutional applications.  *Id.* at 725.  This is not an exact science.  When the substantial effect of a law is to regulate protected speech without constitutional justification, the law is facially invalid.  *See NIFLA*, 585 U.S. at 778–79 (compelled disclosure facially invalid).  Facial relief is the natural remedy here because the Act compels speech without justification and thus fails the First Amendment "in every case," in the same way.  *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021) (granting facial relief).

At the first step, the Act compels covered businesses to publish a particular consumer warning. Compelling a business to publish a government script commandeers speech protected by the First Amendment.  *NIFLA*, 585 U.S. at 766; *Zauderer*, 471 U.S. at 651.  Thus, unlike the statutes that regulated how covered online services moderated third-party content in *Moody*— where the evidence did not show that every covered entity's content moderation practices was expressive activity protected by the First Amendment, 603 U.S. at 726—the Act here regulates speech "in every case," in the same ways. *Americans for Prosperity*, 594 U.S. at 618.

The question at the second step is which of those applications are unconstitutional, which are constitutional, and how those applications compare. *Every* application of the Act is unconstitutional. Under any level of review, and in any application, the State must justify the Act by demonstrating that it advances a solution to a real problem. *See NIFLA*, 585 U.S. at 776–77. The State cannot meet that burden because there is no evidence that algorithmic pricing deceives, confuses, or misleads consumers. Likewise, under any level of review, and in any application, the State must show that its compelled disclosure is (at least to some degree) narrowly tailored. *Id.* at 776–77, 778. The State cannot meet that burden either, because the Act is, in any application, both more over- and underinclusive than even *Zauderer* allows.

The Act lacks constitutional justification, and that defect mars any possible application of the law. Even where the Act compels a disclosure alongside a hypothetically exploitative algorithmically determined price, for example, the means employed to compel that warning—requiring it in every case, without evidence that consumers would benefit from it, and applying it only to certain industries' advertisements—fails any level of First Amendment review. The Act thus violates the First Amendment in all applications—not just a substantial number—so it is facially overbroad. *Moody*, 603 U.S. at 723.

## II.    NRF Will Suffer Irreparable Harm Absent An Injunction.

NRF members will suffer several types of irreparable injury absent relief.

*First*, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because NRF has shown that it is likely to succeed on the merits of its First Amendment claim, that is enough to establish irreparable harm. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486–87 (2d Cir. 2013) (irreparable harm from likelihood of success on First Amendment claim).

*Second*, if NRF members comply with the Act, they will suffer significant and irreparable

harm to their reputation and goodwill with customers.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("loss of reputation, good will, and business opportunities" constituted irreparable harm); *NECD Corp. v. H&B, Inc.*, 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (same), *aff'd*, 282 F. App'x 885 (2d Cir. 2008); *see also* Moller Decl. ¶¶ 10-12, 16; Ravinett Decl. ¶¶ 9-11; Roodman Decl. ¶¶ 9-11, 14; Eggert Decl. ¶¶ 8-9; NRF Decl. ¶¶ 23-24, 28.

*Third*, NRF members who incur compliance costs before permanent relief can issue would not be able to recover those costs since the State "would be precluded … by sovereign immunity" from providing money damages.  *AVCO Fin. Corp. v. Commodity Futures Trading Comm'n*, 929 F. Supp. 714, 717 (S.D.N.Y. 1996) (acknowledging that "economic injuries ordinarily compensable in money damages" may become irreparable injuries for this reason); *see also, e.g.*, *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 93 (9th Cir. 2009).

*Fourth*, even if NRF members choose *not* to comply with the Act, they will face penalties of up to $1,000 per violation—which could amount to billions of dollars for very large online retailers with millions, tens of millions, or even hundreds of millions of products on their online marketplaces.  NRF Decl. ¶ 29.  That choice, too, would result in irreparable harm.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (forcing such a choice threatens irreparable injury); *e.g.*, *Satellite TV of N.Y. Assocs. v. Finneran*, 579 F. Supp. 1546, 1551 (S.D.N.Y. 1984) (choice between complying with law or incurring a fine of $2,000 per day "readily" satisfied irreparable harm inquiry).

## III.    NRF Satisfies The Remaining Preliminary Injunction Factors.

The remaining factors—the balance of equity and the public interest—"merge" when the government is the defendant.  *Homeland Sec.*, 969 F.3d at 59.  They favor an injunction here.

Absent a preliminary injunction, NRF members will suffer a loss of their First Amendment rights and either damage to its reputation and customer goodwill or substantial civil penalties.  In

contrast, the State "does not have an interest in the enforcement of an unconstitutional law." *725 Eatery Corp. v. City of N.Y.*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019).  The public interest further supports "securing First Amendment rights," *N.Y. Progress & Prot. PAC*, 733 F.3d at 488, "and it is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy or law," *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016).

## CONCLUSION

NRF respectfully requests an order preliminarily enjoining enforcement of the Act on its face, and as applied to NRF's members.[7]


Dated: Seattle, Washington
     July 2, 2025

                    Respectfully submitted,

                    By: */s/      Ambika Kumar*
                        Ambika Kumar

Adam S. Sieff (*pro hac vice* pending)
Joseph Elie-Meyers (*pro hac vice* pending)
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071-3487
Tel: (213) 633-6800
adamsieff@dwt.com
josepheliemeyers@dwt.com

David M. Gossett (*pro hac vice* pending)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Tel: (202) 973-4200
davidgossett@dwt.com

Ambika Kumar (*pro hac vice* pending)
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Tel: (206) 622-3150
ambikakumar@dwt.com

Alexandra Perloff-Giles (NY Bar # 5686944)
Nimra H. Azmi (NY Bar # 5466693)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
alexandraperloffgiles@dwt.com

*Attorneys for Plaintiff*
*National Retail Federation*

---

[7] The Court should not require NRF to post a bond since the State will not incur any costs or damages if the Court wrongfully enjoins the Act.  *725 Eatery Corp.*, 408 F. Supp. 3d at 470.

## CERTIFICATION OF WORD COUNT

I certify that the qualifying portions of the foregoing memorandum of law contains 8,745

words and therefore complies with Local Rule 7.1(c).


/s/    *Ambika Kumar*
Ambika Kumar

28