UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL RETAIL FEDERATION,

*Plaintiff*,

- against -

LETITIA JAMES, in her official capacity
as Attorney General of New York,

*Defendant*.

Case No. 1:25-cv-05500

---

**BRIEF OF THE CHAMBER OF PROGRESS AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

PAGE

I.    THE LEGISLATIVE RECORD SHOWS THAT THE ACT IS UNSUPPORTED AND
      OVERBROAD…………………………………………………………………3

II.   THE ACT CANNOT WITHSTAND STANDARD OF FIRST AMENDMENT SCRUTINY…5

      A.    The Act fails intermediate scrutiny……………………………………5

      B.    The Act also fails *Zauderer* review……………………………………...7

III.  THE ACT DISINCENTIVIZES INNOVATION AND WILL LIKELY MISLEAD
      CONSUMERS IN NEW YORK…………………………………………………...9

      A.    Algorithmic pricing has many benefits for consumers, such as lower
            prices and service enhancements……………………………………9

      B.    Mandatory disclosures like the one required by the Act tend to be
            unhelpful to consumers…………………………………………...10

      C.    The Act squelches pro-consumer benefits while inviting confusion...12

TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Anderson v. Treadwell*,
  294 F.3d 453, 462 (2d Cir. 2002)...................................................................5

*Art & Antique Dealers League of Am., Inc. v. Seggos*,
  121 F.4th 423, 442 (2d Cir. 2024)...............................................................6

*Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58 (W.D. Pa. 2023), *aff'd as modified*,
  No. 23-2574, 2025 WL 2250261 (3d Cir. Aug. 7, 2025).....................................8

*Edenfield v. Fane*,
  507 U.S. 761 (1993). ..............................................................................5, 6, 7

*Evergreen Ass'n, Inc. v. City of N. Y.*,
  740 F.3d 233 (2d Cir. 2014)........................................................................7

*Greenley v. Kochava, Inc.*,
  684 F. Supp. 3d 1024 (S.D. Cal. 2023) .........................................................8

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020).......................................................................8

*In re Hulu Priv. Litig.*,
  No. C 11–03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014)....................8

*In re Nickelodeon Consumer Priv. Litig.*,
  827 F.3d 262 (3d Cir. 2016)........................................................................8

*Nat'l Ass'n of Mfrs. v. S.E.C.*,
  800 F.3d 518, 530 (D.C. Cir. 2015) ...........................................................5, 6

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755, 776 (2018) ...........................................................................8

*Solomon v. Flipps Media, Inc.*,
  136 F.4th 41 (2d Cir. 2025).........................................................................8

*Vugo, Inc. v. City of N. Y.*,
  931 F.3d 42, 44 (2d Cir. 2019).....................................................................5

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio.*
  471 U.S. 626..........................................................................................7, 8

**Statutes**

N.Y. Gen. Bus. L. § 349 ....................................................................1, 2, 4, 8, 12

**Other Authorities**

Cody Taylor, The Case for Algorithmic Pricing: Consumer Welfare, Market
  Efficiency, and Policy Missteps, The Mercatus Center, (May 14, 2025),
  https://www.mercatus.org/research/policy-briefs/case-algorithmic-pricing-
  consumer-welfare-market-efficiency-and-policy ................................................................10

Emérita Torres and Rachel May, *Opinion: New York must fight back against
  surveillance pricing*, City & State New York (Apr. 11, 2025),
  https://www.cityandstateny.com/opinion/2025/04/opinion-new-york-must-
  fight-back-against-surveillance-pricing/404482/?oref=csny-category-lander-
  top-story ..........................................................................................................................4

Fred L. Smith and Braden Cox, Airline Deregulation, The Library of
  Economics and Liberty,
  https://www.econlib.org/library/Enc/AirlineDeregulation.html (last visited
  Aug. 21, 2025).............................................................................................................2, 10

Kevin R. Williams, The Welfare Effects Of Dynamic Pricing: Evidence From
  Airline Markets, Cowles Foundation Discussion Paper No. 2103u3, (Aug.
  2021) https://cowles.yale.edu/sites/default/files/2022-09/d2103-u3.pdf. ........................2, 10

Omri Ben-Shahar & Carl E. Schneider, *The Failure Of Mandated Disclosure*,
  159 Penn. L. Rev 647 (2010) ............................................................................................10

Sponsor Memo, S.B. S7033, 2025 Leg., 227*th* Sess. (N.Y. 2025),
  https://www.nysenate.gov/legislation/bills/2025/S7033.......................................................4

S.B. S7033, 2025 Leg., 227th Sess. (N.Y. 2025)...................................................................3, 4

## INTEREST OF AMICUS CURIAE

Chamber of Progress is a technology-industry coalition[1] devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress supports public policies that will build a fairer, more inclusive country in which the technology industry operates responsibly and fairly for all people. In keeping with that mission, Chamber of Progress supports responsible regulations that protect constitutional principles, including free speech, promote innovation and economic growth, and empower technology customers and users.

Chamber of Progress has a direct interest in ensuring that digital commerce regulations promote rather than inhibit innovation and that government involvement in the marketplace does not inadvertently harm consumer welfare. This includes promoting jurisprudence that incentivizes the development of platforms needed to deliver innovative products and services to the public. It also includes promoting jurisprudence that guards against sweeping government speech requirements that are unsubstantiated and unhelpful to consumers.

The algorithmic pricing disclosure included in the Algorithmic Pricing Disclosure Act ("Act"), codified in N.Y. Gen. Bus. Law ("NYGBL") § 349-a, compels certain businesses in New York to disclose when they use "personalized algorithmic pricing" and display an ambiguous and ominous warning that a price was determined using "your personal data." This law, which was originally proposed to address the narrow issue of discrimination in pricing and was rushed through the legislature, will likely cause widespread consumer confusion and disincentivize pro-consumer practices like discounts and service enhancements. The Act, therefore, without a clear

---

[1] Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on or veto power over its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree. Chamber of Progress' corporate partners are listed at: https//progresschamber.org/partners.

governmental interest or tailoring, stands to threaten constitutional values and innovation. For these reasons, Chamber of Progress submits this brief in support of the National Retail Federation's ("NRF") opposition to the State's motion to dismiss NRF's complaint.

## SUMMARY OF ARGUMENT

A wide variety of businesses use algorithmic pricing to benefit consumers. This technology helps to lower prices, enhance market efficiency, and promote competition. For example, since the airline industry started using algorithmic pricing in the 1980s, the technology has contributed to a 45% reduction in prices to fly.[2]   Algorithmic pricing also helps to power innovation, enabling businesses to create new types of products and services to meet consumers' evolving needs.

New York's Algorithmic Pricing Disclosure Act imposes sweeping and untethered restrictions on these pro-consumer practices. It requires a government-scripted statement whenever a business engages in conduct that falls under the Act's broad definition of "personalized algorithmic pricing." NYGBL § 349-a. The required message states: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA." *Id*. This ominous statement, which also needs to be posted in accordance with the Act's formatting requirements, insinuates that a business has done something nefarious even for simple offerings that are consistent with consumer expectations, such as a loyalty discount. The statement is thus likely to confuse consumers and disincentivize practices with a record of helping consumers and innovation.

The Act's overreach is particularly egregious in light of its legislative history. The Act started as a bill focused on discriminatory pricing, thus targeting activity much narrower than any

---

[2]  Fred L. Smith and Braden Cox, Airline Deregulation, The Library of Economics and Liberty, https://www.econlib.org/library/Enc/AirlineDeregulation.html (last visited Aug. 21, 2025); *see also* Kevin R. Williams, The Welfare Effects Of Dynamic Pricing: Evidence From Airline Markets, Cowles Foundation Discussion Paper No. 2103u3, (Aug. 2021) https://cowles.yale.edu/sites/default/files/2022-09/d2103-u3.pdf.

use of data in algorithmic pricing. The legislature also failed to conduct independent fact-finding or hold hearings that would have addressed how the law would work or help consumers. This legislative history underscores how the mandated disclosure is unjustified and far out of proportion with the State's asserted interests.

The First Amendment does not tolerate this sort of speech-restrictive overreach. It demands that, when the government regulates how businesses communicate with consumers, it must do so in a way that is principled and proportionate to the asserted government interest. The Act thus fails under any level of First Amendment review. To help protect consumers and innovation, and to promote a regulatory environment that welcomes reasoned obligations and resists arbitrary overreach, Chamber of Progress urges this Court to deny the State's motion to dismiss NRF's complaint.

## ARGUMENT

### I.    The legislative record shows that the Act is unsupported and overbroad.

The Act's legislative history reveals that the legislature failed to engage meaningfully with the benefits of algorithmic pricing or the problems with mandated disclosures. Indeed, the legislative history shows that the Act began as a bill aimed at the narrow issue of discriminatory pricing, which is a poor fit for requirements that apply to *any* variation in pricing. This demonstrates a fundamental lack of legislative justification for the Act.

The original legislation, Senate Bill S7033, entitled the "Preventing Algorithmic Pricing Discrimination Act," had a narrow purpose, focusing on discriminatory instances of employing algorithms to set prices. It included restrictions on using "protected class data," defined as information based on "a characteristic that is legally protected from discrimination," such as "ethnicity, national origin, age, disability, sex, sexual orientation, gender identity and expression, pregnancy outcomes and reproductive health care." S.B. S7033, 2025 Leg., 227th Sess. (N.Y.

3

2025). The sponsor memorandum for Senate Bill S7033 addresses concerns about companies using algorithms "to vary prices by zip code, with patterns suggesting racial and ethnic discrimination."[3] In an opinion piece accompanying the bill's introduction, the bill's sponsor described extreme examples of algorithmic pricing based on detailed web search history, such as "a mother pay[ing] more for baby supplies at checkout because her baby is sick, and she is searching for medicine."[4]

Senate Bill S7033 was then rolled into the budget bill, dropping the "protected class data" protections and even the definition of "protected class data," and was passed in haste without the legislature conducting *any* independent factfinding or hearing *any* testimony from *any* experts. There is no record whatsoever regarding how the mandated disclosure would address the legislature's concerns about discriminatory pricing, what consumers would likely find helpful and how they would likely interpret the disclosure statement, the impacts on free expression, or the potential to dampen innovation. Overall, the scope of the mandated disclosure became *even broader* for the budget bill by reducing allowances for location data that were encompassed in Senate Bill S7033.

This path through the legislature demonstrates that the Act's mandated disclosure is fundamentally untethered to the purpose of the original bill and disproportionate to the needs. The Act was meant to address the narrow problem of pricing discrimination based on the defined protected characteristics. Yet the mandated disclosure applies to *any* variance in price that involves *any* information that "could reasonably be linked, directly or indirectly, with a specific consumer or device," NYGBL § 349(1)(d), making the requirement far beyond the scope of the Act's

---

[3] Sponsor Memo, S.B. S7033, 2025 Leg., 227*th* Sess. (N.Y. 2025),
https://www.nysenate.gov/legislation/bills/2025/S7033.
[4] Emérita Torres and Rachel May, *Opinion: New York must fight back against surveillance pricing*, City & State New York (Apr. 11, 2025),
https://www.cityandstateny.com/opinion/2025/04/opinion-new-york-must-fight-back-against-surveillance-pricing/404482/?oref=csny-category-lander-top-story.

purpose. Moreover, the legislature did not provide any meaningful support for this approach, in spite of the many pro-consumer benefits of algorithmic pricing and potential harms of mandatory disclosure.

## II.        The Act cannot withstand First Amendment scrutiny.

Given the fundamental lack of support in the legislative record, the State's mandated disclosure requirement fails under any standard of First Amendment scrutiny, including intermediate scrutiny and *Zauderer* review.

### A.  The Act fails intermediate scrutiny.

Restrictions on commercial speech are generally subject to intermediate scrutiny, under which the state has the burden of showing that a regulation "directly advances" a "substantial" government interest and is "no more extensive than necessary to serve that interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 44 (2d Cir. 2019). In other words, even if the state has a substantial interest, it must establish "a reasonable fit between [its] ends and the means chosen to accomplish those ends." *Anderson v. Treadwell*, 294 F.3d 453, 462 (2d Cir. 2002) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001)). To satisfy this standard, the State cannot rely on "mere speculation or conjecture" but instead needs to "demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Anderson v. Treadwell*, 294 F.3d 453, 462 (2d Cir. 2002) (quoting *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)). Here, the Act fails under intermediate scrutiny because there is no reasonable fit between the Act's broad mandated disclosure and narrow purpose of addressing discriminatory pricing.

Laws are generally invalid under intermediate scrutiny where requirements are imposed on an underdeveloped record, especially when a law is relatively novel. *See Nat'l Ass'n of Manufacturers v. S.E.C.*, 800 F.3d 518, 530 (D.C. Cir. 2015) ("*NAB*"). For example, in response to political unrest abroad, the SEC promulgated a rule requiring businesses to list products that

were not "conflict free," *i.e.*, products that were derived from minerals that directly or indirectly financially supported certain armed groups. *Id.* The D.C. Circuit Court of Appeals invalidated the requirement, noting that Congress held no hearings regarding the rule's likely impact before passing the underlying statute, and congressional hearings after the statute passed featured conflicting testimony about whether the rule would help or hurt. *Id* at 256. Similarly, in a dispute over a Florida Board of Accountancy prohibition on personal solicitation by certified public accountants, the U.S. Supreme Court concluded that the prohibition was unconstitutional because the state did not offer sufficient evidence, such as studies or anecdotes, to show how the ban protected privacy and prevented fraud—its alleged aims. *See Edenfield*, 507 U.S. at 771. The Supreme Court noted that proof in this case was particularly important given that Florida was one of only four states with similar prohibitions and most states did not impose such restrictions. *Id.*

A law is also likely to fail intermediate scrutiny when its requirements risk undermining the government's purported interests, rather than advancing them. For example, in *NAB*, the D.C. Circuit Court of Appeals observed that the requirements could actually undermine the SEC's aims, worsening the humanitarian crisis by ending jobs or lowering wages. 800 F.3d at 526.

Further, laws are suspect when either there are many alternatives that would be less speech-restrictive, or when the disclosure requirements are particularly inflammatory. As the Second Circuit has noted, the "existence of 'numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . is certainly a relevant consideration.'" *Id.* (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995)). Fundamentally, a state must show "that a more limited restriction . . . would not serve adequately the State's interests." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 442 (2d Cir. 2024), *cert. denied sub nom. Art & Antique Dealers v. Lefton*, No. 24-868, 2025 WL 1496487 (U.S. May 27, 2025) (quoting *Cent.*

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 570 (1980)). Regarding mandated disclosures in particular, scrutiny is heightened for disclosures that are more than "bland" and "non-pejorative." *Cf. Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014).

The Act's mandated disclosure requirement withers under this review. As explained above, the legislature failed to conduct any independent factfinding or hold any hearings, which is especially important for a novel law such as this one. *Cf. Edenfeld*, 507 U.S. at 771. There are no studies or anecdotes to show how the broad requirement addresses discrimination in pricing, which was the law's alleged purpose. Further, there is no justification for the breadth of the law, particularly since it sweeps in situations where the disclosure will create confusion or could be misleading. Additionally, the mandated disclosure seems likely to undermine the State's consumer protection interests, given that the law could disincentivize pro-consumer uses of algorithmic pricing and cause confusion. And the Act is particularly suspect given the inflammatory nature of the disclosure and the many obvious alternatives that would be less burdensome. For example, a statute specifically targeting price-gouging of vulnerable consumers or racial discrimination would be far more appropriately tailored to meet the state's asserted interests here—such as if the "protected class data" in the original bill was actually part of the Act. Instead, the broad, vague disclosures mandated by this statute create a likelihood of consumer confusion and, equally worrisome, conflation of consumer-benefiting pricing schemes with predatory and discriminatory ones, thereby undermining the state's purported interest in requiring these disclosures in the first place and illustrating that the law is not appropriately tailored.

### B.  The Act also fails *Zauderer* review.

Even under the more deferential standard articulated in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), the Act would still fail.

*Zauderer* applies only in a narrow set of circumstances that are not relevant to this case. It applies only to (1) regulations of deceptive advertising, where the government requires (2) the publication of "purely factual" and (3) "uncontroversial" corrective disclosures. 471 U.S. at 651. It is inapplicable here because the required disclosure is not "purely factual" nor "uncontroversial." The mandated disclosure uses the term "personal data," which it broadly defines, seemingly without limitation, as any information that "identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device." NYGBL § 349-a(1)(d). But what constitutes personal data is, in fact, a subject of vigorous debate in privacy law, as evidenced by the plethora of purported privacy lawsuits filed across the country, and the definition's inclusion here of the phrase "indirectly" renders it particularly subject to controversy. *See, e.g. Solomon v. Flipps Media, Inc*., 136 F.4th 41 (2d Cir. 2025) (unique user ID does not constitute personally identifiable information); *In re Hulu Priv. Litig.*, No. C 11–03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) (unique user ID does constitute personally identifiable information); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (browsing history is personally identifiable information); *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58 (W.D. Pa. 2023), *aff'd as modified*, No. 23-2574, 2025 WL 2250261 (3d Cir. Aug. 7, 2025) (browsing history is not personally identifiable information); *In re Nickelodeon Consumer Priv. Litig*., 827 F.3d 262 (3d Cir. 2016) (IP address is not personally identifiable information); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023) (IP address could constitute personally identifiable information).

But even if *Zauderer* were to apply, the pricing provisions would still not pass constitutional muster. A compelled disclosure only survives *Zauderer* if it "is neither unjustified nor unduly burdensome." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra,* 585 U.S. 755, 776 (2018). As explained above, the pricing provisions are both unjustified *and* burdensome. The compelled

disclosure is vastly disproportionate to the concerns about discriminatory pricing that the legislature initially sought to address.

III.     **The Act disincentivizes innovation and will likely mislead consumers in New York.**

Although originally conceived to help consumers, the Act is likely to cause harm by disincentivizing pro-consumer practices and misleading app users about how relevant and specific information is used to determine prices.

A.     **Algorithmic pricing has many benefits for consumers, such as lower prices and service enhancements.**

Dynamic pricing is a practice that has been around for decades and that has created real benefits for consumers in driving prices down. Algorithmic pricing—where a business utilizes technology that gathers real-time information, such as demand, availability, and market conditions, to offer discounts and set prices—is one form of dynamic pricing. The benefits of algorithmic pricing to businesses and consumers have been widely acknowledged by economists across the ideological spectrum. These benefits include driving down prices, market efficiency, encouraging competition, and supporting innovation and adaptability that can provide consumers with new service opportunities.

To illustrate how algorithmic pricing helps with keeping costs down and market efficiency, consider how algorithmic pricing enables businesses to smoothly offer lower prices, discounts, or other promotions to individuals who will value them most. For example, a business marketing a new brand of dog food might be interested in offering promotions to dog owners in order to encourage them to purchase their product. Using algorithmic pricing, a business may be able to target the discount to offer it to users who buy certain types of dog food who may be more interested in the new product.

9

The result of these dynamic adjustments based on real-time data is more frequent discounts, promotions, loyalty programs, special offers, and more. As just one example, the aviation industry was among the first to adopt algorithmic pricing in the wake of Jimmy Carter's 1978 regulatory reform, leading not only to a cratering of average prices—down 45% in real prices since 1978—but also to access to flights by a much wider swathe of the U.S. population.[5]

Additionally, algorithmic pricing plays an important role in helping businesses adapt and innovate, which means consumers can take greater advantage of services that improve their quality of life. Greater business adaptability is achieved through elasticity in pricing, allowing businesses to quickly determine and adjust for where, when, and how much their goods or services are needed. This greater flexibility benefits the consumer by allowing businesses to offer more tailored discounts and coupons.[6]

### B. Mandatory disclosures like the one required by the Act tend to be unhelpful to consumers.

Numerous studies have shown that mandatory disclosures like the one required by the Act are only successful in narrow circumstances and that, more often, such disclosures are unhelpful because they create consumer confusion.

As legal scholars have noted, "[n]ot only does the empirical evidence show that mandated disclosure regularly fails in practice, but its failure is inevitable."[7] This is due to a variety of factors.

---

[5] Fred L. Smith and Braden Cox, Airline Deregulation, The Library of Economics and Liberty, https://www.econlib.org/library/Enc/AirlineDeregulation.html (last visited Aug. 21, 2025); *see also* Kevin R. Williams, The Welfare Effects Of Dynamic Pricing: Evidence From Airline Markets, Cowles Foundation Discussion Paper No. 2103u3 (Aug. 2021) https://cowles.yale.edu/sites/default/files/2022-09/d2103-u3.pdf.

[6] Cody Taylor, The Case for Algorithmic Pricing: Consumer Welfare, Market Efficiency, and Policy Missteps, The Mercatus Center (May 14, 2025), https://www.mercatus.org/research/policy-briefs/case-algorithmic-pricing-consumer-welfare-market-efficiency-and-policy

[7] Omri Ben-Shahar & Carl E. Schneider, *The Failure Of Mandated Disclosure*, 159 Penn. L. Rev 647 (2010).

For example, mandated government statements tend to do a poor job of communicating useful and accurate information to consumers. Research shows that they often create consumer confusion, and consumer comprehension of information in advertisements may be significantly lower in advertisements with these disclosures than without.[8] Relatedly, mandated disclosures can impede other efforts by a business to communicate effectively with customers by taking up valuable real estate on a website or app.

The mandated disclosure under the Act is particularly unhelpful to consumers because it provides no specificity and uses ominous language with no context. It is misleading in tone and substance, suggesting that because personal data is used, that means personal (and maybe sensitive) data is being misused. The disclosure is required in almost any circumstance where personal data is used to vary a price, including ones where the disclosure is not necessarily accurate. For example, when a consumer pays for shipping, they likely expect that their location is used to set the price for shipping. By mandating this disclosure, the law creates confusion as to whether other, more sensitive, data may be used. As a result, it is likely to deceive consumers and prejudice legitimate business interests by forcing potentially misleading speech. Additionally, because the disclosure is mandated in so many circumstances, it is unlikely to further any substantial government interests as consumers will simply learn to ignore the disclosure. Repeat messages often suffer from a phenomenon known as "habituation," which occurs when people are repeatedly exposed to the same stimulus, making it less salient. Habituation causes people to sometimes disregard messages that they repeatedly confront, and this effect is particularly strong when warnings are text-based and unvarying.[9]

---

[8] *Id.*

[9] *See* Mostafa Purmehdi, Renaud Legoux, & Sylvain Senecal, *The Effectiveness of Warning Labels for Consumers: A Meta-Analytic Investigation into Their Underlying Process and*

### C.  The Act squelches pro-consumer benefits while inviting confusion.

New York's burdensome pricing law lessens the benefits of algorithmic pricing while causing serious confusion for consumers. In order for any pricing system to work, businesses will typically need to consider at least some aspects of data that "identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device." This information could be as basic as location, which will often affect service costs.[10] Consequently, businesses employing long-established, basic pricing schemes will need to adopt a confusing disclosure or risk legal penalties. This disincentivizes businesses from using beneficial technology, depriving consumers of potential savings, competition, and innovative offerings.

Moreover, consumers are likely to find the mandated disclosure unhelpful. The statement "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA" is inflammatory and confusing. It fails to describe with any nuance how a price was actually determined and suggests that the business has engaged in some nefarious activity. This could also desensitize users to how their data is used in other scenarios, leading them to pay less attention when more consequential decisions about data are at stake.

*Contingencies*, 26 J. of Pub. Policy and Marketing 1 (Apr. 1, 2017); Grant E. Donnelly, Laura Y. Zatz, Dan Svirsky, and Leslie K. John, *The Effect of Graphic Warnings on Sugary-Drink Purchasing*, 29 Psychological Sci. 1321 (Feb. 2, 2018); Soyun Kim and Michael S. Wogalter, *Habituation, Dishabituation, and Recovery Effects in Visual Warnings*, Proceedings of the Human Factors and Ergonomics Society 53rd Annual Meeting (2009) https://www.safetyhumanfactors.org/wp-content/uploads/2020/07/308)Kim,Wogalter(2009).pdf.
[9] Kersten C. Green and J. Scott Armstrong, *Evidence on the Effects of Mandatory Disclaimers in Advertising*, 31 J. of Pub. Policy and Marketing 293 (2012).
[10] The Act has an exception for location data, but it is narrow and applies only to data "used by a for-hire vehicle . . . solely to calculate the fare based on mileage and trip duration between the passenger's pickup and drop-off locations." NYGBL § 349-a(d).

## CONCLUSION

For the foregoing reasons, this Court should deny the State's motion to dismiss NRF's complaint.

Dated: August 21, 2025                              Respectfully submitted,

*/s/Jasmeet K. Ahuja*
Jasmeet K. Ahuja
Batya Kemper*
Hogan Lovells US LLP
(212) 918-3000
390 Madison Ave
New York, NY 10017

Mark W. Brennan*
Thomas Veitch*
Hogan Lovells US LLP
(202) 637-5600
555th St NW
Washington, DC 20004

*Counsel for Amicus Curiae,*
*Chamber of Progress*
*\*Pro Hac Vice Forthcoming*

13

**CERTIFICATE OF COMPLIANCE**

This amicus brief is filed as permitted by the Court's August 15, 2025 minute entry. I certify that this brief is 13 pages long and thus complies with the 25-page limit contained in Judge Rakoff's Individual Rule of Practice 2(e).


*/s/Jasmeet K. Ahuja*
Jasmeet K. Ahuja