UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL RETAIL FEDERATION,

Plaintiff,

-v-

LETITIA JAMES, in her official capacity as Attorney General of New York,

Defendant.

25-cv-5500 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

Plaintiff National Retail Federation challenges a recently enacted New York State law that requires merchants to disclose when a published price has been set by algorithm using a consumer's personal data. See N.Y. Gen. Bus. Law § 349-a (McKinney 2025). Plaintiff alleges that the disclosure requirement violates the First Amendment's prohibition on compelled speech.

Now before the Court are two motions: plaintiff's motion for a preliminary injunction and defendant's motion to dismiss. For the reasons set forth below, the Court concludes that plaintiff has not plausibly alleged that the challenged disclosure requirement runs afoul of the First Amendment. The Court therefore grants the motion to dismiss and, for the same reasons, denies the request for a preliminary injunction.

## I. Background

Where relevant, facts are drawn from the complaint and accepted as true for the purposes of the motion to dismiss. Anemone v. Metropolitan Transp. Auth., 410 F. Supp. 2d 255, 261 (S.D.N.Y. 2006).

### A. The Algorithmic Pricing Disclosure Act

On May 9, 2025, the New York state legislature enacted the Algorithmic Pricing Disclosure Act ("the Act") as part of an omnibus budget bill. See 2025 N.Y. Sess. Laws Ch. 58, Pt. X (S. 3008-C). As relevant here, the Act provides that any entity domiciled or doing business in New York that

> sets the price of a specific good or service using personalized algorithmic pricing, and that directly or indirectly, advertises, promotes, labels or publishes a statement, display, image, offer or announcement of personalized algorithmic pricing to a consumer in New York, using personal data specific to such consumer, shall include with such statement, display, image, offer or announcement, a clear and conspicuous disclosure that states: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA."

N.Y. Gen. Bus. Law § 349-a(2).

The Act defines "personalized algorithmic pricing" as "dynamic pricing set by an algorithm that uses personal data," which the Act further defines as "any data that identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device." Id. § 349-a(1)(d), (f). The Act excludes from this definition location data used by a "for-hire" or "transportation network company" vehicle to calculate a passenger's fare based on mileage and travel time. Id. The Act also excludes from its coverage entities that are regulated under state insurance law and certain regulated financial

institutions, as well as discounted prices offered to consumers under "existing subscription-based agreement[s]." Id. § 349-a(3).

To fulfill the Act's disclosure obligation, a merchant must publish the required disclosure "in the same medium as" and "on, at or near and contemporaneous" with the announcement of the price, "using lettering and wording that is easily visible and understandable to the average consumer." Id. § 349-a(1)(b).

The Act is enforceable only by the New York State Attorney General, who must first issue a "cease and desist letter . . . specifying the alleged violation or violations" and setting forth a timeline to cure the violation. If the violation is not remedied, the Attorney General may seek a judicial injunction, as well as civil penalties of up to $1000 per violation. Id. § 349-a(4).

**B. Procedural History**

On July 2, 2025, plaintiff National Retail Foundation filed this suit, alleging that the Act's disclosure requirement violates the First Amendment. See generally Complaint, ECF No. 1. The complaint named Letitia James, the New York State Attorney General, as defendant. That same day, plaintiff also moved for a preliminary injunction against the Act's enforcement. See ECF No. 9.

Plaintiff is a retail trade association whose "members use price-setting technologies covered by the Act" to publish prices to consumers in New York and who are therefore "subject to its [disclosure] requirement." Compl. ¶ 5; see also id. ¶¶ 10-14 (describing plaintiff's members' use of pricing algorithms to "offer

promotions, adjust pricing, and reward consumer loyalty"). Plaintiff argues that the Act "compels a broad range of retailers," including its members, "to express a misleading and controverted government-scripted opinion without justification" and that it therefore violates its members' First Amendment rights. Id. ¶¶ 2, 28-36.

Subsequently, the Court granted the parties' application to set a joint briefing schedule for plaintiff's preliminary injunction motion and for defendant's anticipated motion to dismiss. See ECF No. 13. Defendant also agreed to stay enforcement of the Act until 30 days after the Court rules on the preliminary injunction motion, and to not retroactively enforce the Act for any alleged violations that occur before the end of that period. See ECF No. 16.

Defendant then moved to dismiss the action, arguing that plaintiff fails to state a cognizable First Amendment claim because the Act is subject to, and passes muster under, so-called Zauderer review. See Zauderer v. Off. of Disciplinary Counsel, 471 U.S. 626 (1985); Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint, ECF No. 21 ("MTD").

Both the motion to dismiss and the preliminary injunction motion have now been fully briefed and argued and are ripe for resolution. Because the Court grants the motion to dismiss and enters judgment dismissing the action, it need not separately address plaintiff's motion for a preliminary injunction. See Bryant v. New York State Educ. Dep't, 692 F.3d 202, 219 (2d Cir. 2012) (if a party cannot

sustain any of its claims for relief, it necessarily cannot satisfy the requirements for a preliminary injunction).

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Legal conclusions and conclusory or speculative assertions are not to be taken as true.

## III. Discussion

### A. First Amendment Framework

Just as the First Amendment limits the government's power to restrict expression, it also curtails its power to compel speech. See Volokh v. James, 148 F.4th 71, 84 (2d Cir. 2025). To determine whether a particular law runs afoul of these limits, courts employ different levels of judicial scrutiny, depending on the type of expression and the nature of the restriction at issue. Id.

On the whole, laws regulating commercial speech are subject to a less-exacting standard of review than are laws regulating other forms of speech. See Nat'l Elec. Mfrs. Ass'n v. Sorrell (NEMA), 272 F.3d 104, 113 (2d Cir. 2001); see also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 562-63 (1980) ("The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). Under this

umbrella, restrictions on speech are also treated differently from compelled disclosures.

A law that prohibits or restricts commercial speech must survive so-called "intermediate" scrutiny in order to pass constitutional muster. See Central Hudson, 447 U.S. at 566. This means that the regulation must "directly advance[] a substantial governmental interest" and must not be "overly restrictive." Safelite Grp., Inc. v. Jepsen, 764 F.3d 258, 261 (2d Cir. 2014). By contrast, a law that requires the disclosure of "'purely factual and uncontroversial information' about the goods or services the speaker may offer" is governed by the more permissive Zauderer standard of review. Volokh, 148 F.4th at 85-86 (quoting Zauderer, 471 U.S. at 651). Under Zauderer, a commercial disclosure law does not offend the Constitution so long as it is "'reasonably related to the state's interest in preventing deception of consumers,' and [is] not 'unjustified or unduly burdensome.'" Id. at 85 (quoting Zauderer, 471 U.S. at 651).[1]

Under Zauderer, the fact that First Amendment scrutiny applicable to commercial disclosure requirements is relatively "relaxed" follows from the fact that the First Amendment protection afforded commercial

[1] Although the Second Circuit "has often described scrutiny under Zauderer as 'rational basis' review," it recently declined to settle whether the Zauderer standard "is tantamount to traditional or perhaps more rigorous rational basis review, or whether it is better characterized as a special and more relaxed application of intermediate scrutiny." Volokh, 148 F.4th at 85 n.6. What is clear is that Zauderer is in all events "more relaxed than ordinary intermediate or strict scrutiny." Id. Accordingly, following the Second Circuit's lead, the Court simply refers to "Zauderer scrutiny."

speech "is justified principally by the value to consumers of the information such speech provides." Id. at 86-87 (quoting Zauderer, 471 U.S. at 651). Accordingly, a seller's First Amendment "interest in not providing any particular factual information in his advertising is minimal." Id. (emphasis omitted) (quoting Zauderer, 471 U.S. at 651). Moreover, unlike a "flat prohibition[] on [commercial] speech," disclosure requirements "trench much more narrowly" on sellers' First Amendment interests because they do not prevent sellers from conveying any message of their own but merely require them "to provide somewhat more information than they might otherwise be inclined to present." Id. at 650; see also NEMA, 272 F.3d at 113-14 ("Commercial disclosure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests.").

**B. Level of Scrutiny**

The parties do not dispute that the disclosure requirement at issue here is a regulation of speech and therefore triggers at least some form of heightened judicial scrutiny. The parties disagree, however, about the appropriate level of scrutiny.

Defendant argues that the Act should be subject to Zauderer review because it mandates the disclosure of "'purely factual and uncontroversial' commercial speech." MTD 6 (quoting New York State Rest. Ass'n v. New York City Bd. of Health (NYSRA), 556 F.3d 114, 134

(2d Cir. 2009)). Plaintiff, however, contends that the disclosure requirement attracts at least intermediate scrutiny.[2] Plaintiff acknowledges that the Act "compels commercial speech," but nonetheless argues that it does not qualify for Zauderer review for two reasons. First, plaintiff, citing Sorrell v. IMS Health Inc., 564 U.S. 552 (2011), and the Act's limited exceptions, maintains that the Act should be subject to intermediate scrutiny because "it singles out a class of speakers for differential treatment based on the subject matter of their speech." See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint 14, ECF No. 31 ("MTD Opp."). Second, plaintiff argues that because the Act is not directed at "deceptive advertising" and the disclosure it requires is neither "purely factual" nor "uncontroversial" it does not meet the necessary prerequisites for Zauderer to apply. Id. at 16.

To start, plaintiff's reliance on Sorrell, which dealt with a restriction on speech and not a commercial disclosure requirement, misses the mark. The Second Circuit has reaffirmed on multiple occasions after Sorrell issued that the two-part framework applicable to government regulation of commercial speech subjects disclosure

[2] The Court does not address plaintiff's alternative argument that "[s]trict scrutiny should apply because the Act arbitrarily singles out some commercial speakers . . . based on the subject matter of their advertisements." See Memorandum of Law in Support of Motion for Preliminary Injunction 11 & n.5, ECF No. 9-1 ("PI Mtn."); see also MTD Opp. 7 n.2. Plaintiff concedes that "the Act is likely not subject to strict scrutiny under Second Circuit precedent" and acknowledges that it merely seeks to preserve this argument for later review. See PI Mtn. 11 & n.5; MTD Opp. 7 n.2.

requirements to a standard of review more forgiving than that applicable to restrictions on commercial speech. See, e.g., Volokh, 148 F.4th at 85-87; CompassCare v. Hochul, 125 F.4th 49, 64-65 (2d Cir. 2025); Safelite, 764 F.3d at 262; cf. Vugo, Inc. v. City of New York, 931 F.3d 42, 49-50 (2d Cir. 2019) (concluding that Sorrell did not alter or displace the First Amendment framework applicable to commercial speech restrictions).

Plaintiff points to no case in which Sorrell has ever been applied to evaluate the constitutionality of a commercial disclosure requirement, nor any other support for its contention that Sorrell, which dealt with a restriction on speech that was concededly viewpoint discriminatory, has any application to a run-of-the-mill commercial disclosure mandate such as the one here at issue. See Sorrell, 564 U.S. at 564-65 ("Given the legislature's expressed statement of purpose, it is apparent that [the challenged law] imposes burdens that are . . . aimed at a particular viewpoint."); see also Vugo, 931 F.3d at 50 n.7 (explaining that the restriction in Sorrell sought to "'quiet[]' truthful speech with a particular viewpoint that [the government] 'fear[ed] . . . might persuade'" (quoting Sorrell, 564 U.S. at 576)).

Indeed, the underlying reasons for subjecting commercial disclosure requirements to more forgiving First Amendment scrutiny underscore why Sorrell's concern for "content-and-speaker-based restrictions" does not translate to the commercial disclosure context. Sorrell, 564 U.S. at 564. Unlike restrictions on commercial speech,

which trigger First Amendment scrutiny because of the danger that restricting speech of any kind poses to the "robust and free flow of accurate information," disclosure mandates in fact "promote" the free flow of information that is so fundamental to the First Amendment's reach. NEMA, 272 F.3d at 114 (emphasis added); see also Sorrell, 564 U.S. at 566 (the "consumer's concern for the free flow of commercial speech" justifies the application of heightened scrutiny to a law whose purpose is to "suppress [commercial] speech" (quoting Bates v. State Bar of Ariz., 433 U.S. 350, 364 (1977))).

Accordingly, the regulations at issue in Sorrell prompted heightened scrutiny in part because they had "the effect of preventing [certain speakers] -- and only [those speakers] -- from communicating . . . in an effective and informative manner." Sorrell, 564 U.S. at 564 (emphasis added); see also Vugo, 931 F.3d at 50 n.7. Such an uneven restriction on speech unquestionably poses a threat to the free exchange of ideas. By contrast, the limited exceptions to the disclosure mandate at issue here do not trigger similar concerns, as a disclosure mandate, by its nature, imposes no restriction whatsoever on the free flow of ideas.[3]

---

[3] Whether there exists some set of facts under which a disclosure requirement may in practice so burden a particular viewpoint or subject matter or disadvantage certain speakers so as to trigger the speech-restrictive concerns that motivated the Court in Sorrell is not presented by this case. Plaintiff makes no argument that the limited exceptions from the Act's disclosure requirement have any such effect, simply pointing to the fact that the Act contains exceptions. But that argument is, if anything, best addressed as an argument about the Act's underinclusivity and properly addressed as part of the assessment of its means-end fit. See, e.g., NEMA, 272 F.3d at 115-16 (rejecting

Turning to Zauderer, the Court is not persuaded by any of plaintiff's reasons for concluding that Zauderer does not apply in this case. "[I]nformational disclosure law[s] . . . [are] subject to review under Zauderer," Safelite, 764 F.3d at 262, so long as the required disclosure is of "'purely factual and uncontroversial information' about the goods or services the speaker may offer," Volokh, 148 F.4th at 86 (quoting Zauderer, 471 U.S. at 651); see also NEMA, 272 F.3d at 115 ("Zauderer, not Central Hudson [], describes the relationship between means and ends demanded by the First Amendment in compelled commercial disclosure cases."). Plaintiff has not plausibly alleged that the disclosure mandated by the Act fails to satisfy these requirements.

First, the statement requirement by the Act -- "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA" -- is plainly factual. Plaintiff concedes as much, acknowledging that pricing algorithms "analyze data and publish prices" based on "consumer inputs," and that its members use algorithmic pricing to set prices and offer promotions. Compl. ¶ 11. The Act "by its terms applies only [when a price was set using personalized algorithmic pricing]" and therefore "the disclosure[] [is] necessarily accurate." Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 251 (2010). In other words, only

---

the argument that a challenged commercial disclosure law was "unconstitutionally underinclusive" because it "does not get at all facets of the problem it is designed to ameliorate" (quoting Zauderer, 471 U.S. at 652 n.14)).

when a merchant has literally satisfied the disclosure must the merchant "identify" as much. Id. Accordingly, the required disclosure "accurate[ly]" describes plaintiff's members' practices. NEMA, 272 F.3d at 114 & n.4.

To avoid this conclusion, plaintiff points to caselaw from the Ninth Circuit, arguing that the required disclosure is not "purely factual" even if "literally true" because it is "misleading and, in that sense, untrue." Nat'l Ass'n of Wheat Growers v. Bonta, 85 F. 4th 1263, 1276 (9th Cir. 2023) (quoting CTIA v. City of Berkeley, 928 F.3d 832, 847 (9th Cir. 2019)). Even accepting, in the absence of any similar Second Circuit precedent, the proposition that certain "literally true" statements are excluded from Zauderer's reach, plaintiff has not plausibly alleged that the disclosure required here is "misleading." In Wheat Growers, the Ninth Circuit explained that the statement that a certain chemical is "known . . . to cause cancer" was not a "purely factual" statement because "the use of the word 'known' [was] misleading" in context. 85 F.4th at 1268, 1278 (quoting Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics (CERT), 29 F.4th 468, 479 (9th Cir. 2022)). That was so because "an ordinary consumer would not understand the nuance between 'known' as defined in the statute and 'known' as commonly interpreted without the knowledge of the scientific debate on that subject." Id.

Plaintiff does not identify any similarly misleading aspect of the disclosure here. Instead, it merely speculates that the overall statement "gives the misleading, imaginary and 'unsubstantiated'

impression that price-setting algorithms are 'dangerous,'" that they involve "non-consensual invasive surveillance," and that they set prices in ways that are harmful to the consumer. PI Mtn. 19 (quoting Wheat Growers, 85 F.4th at 1277, 1279); MTD Opp. 17. The Court notes that plaintiff's assertions about how consumers will react to the disclosure are entirely speculative.[4] See Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 555 (2007) (allegations "must be enough to raise a right to relief about the speculative level").

In any event, Wheat Growers provides no support for plaintiff's argument, which focuses on the disclosure's "overall message," and not on any specific aspect of the disclosure that plaintiff contends is misleading. See MTD Opp. 17. By contrast, in Wheat Growers, the Ninth Circuit's conclusion was based on the presence of specific language in the challenged warning that it reasoned was susceptible to misinterpretation and that, if so interpreted, would make the statement

---

[4] In support of its preliminary injunction motion, plaintiff includes affidavits from several of its members expressing their "fear" that customers "may be dissuaded" from purchasing their products if accompanied by the required disclosure because consumers "may think" that they are using personal data to increase prices or that they are using certain categories of sensitive personal data when setting prices. See Moller Decl. ¶ 12, ECF No. 9-4; see also, e.g., Eggert Decl. ¶ 8, ECF No. 9-2 ("I believe th[e] disclosure would give everyone visiting my website or my product page the categorically false idea that I am misusing their information or not respecting their privacy."); Roodman Decl. ¶ 9, ECF No. 9-6; Ravinett Decl. ¶ 8, ECF No. 9-5. Even aside from the fact that the affidavits are irrelevant to defendant's motion to dismiss, these statements, which are not based on plaintiff's member's personal knowledge, do not rise above the level of speculation or conjecture about how consumers will react to the mandated disclosure.

demonstrably false. See Wheat Growers, 85 F.4th at 1278 (reasoning that "a 'known' carcinogen carries a complex legal meaning that consumers would not glean" and which is distinct from the lay meaning of the term (quoting CERT, 29 F.4th at 479)). To the extent that the court in Wheat Growers referenced the "totality of the warning," it did so only to explain why other parts of the statement could not adequately correct the misimpression communicated by the use of the word "known," and not to invite an assessment of a consumer's overall reaction to the message. Id. at 1279.

Plaintiff does point to the terms "personal data" and "algorithm" in this disclosure, speculating that because they are "undefined" they will "falsely imply that the price to which that disclosure is attached is exploitative and based on sensitive personal information, even when it is not." MTD Opp. 17. But, unlike in Wheat Growers, plaintiff stops short of alleging that the meaning of those individual terms, as used in the disclosure, is demonstrably odds with their ordinary meaning and, in that sense, misleading. Plaintiff's argument thus "amounts to little more than a preference" for other terms, not an argument that the terms adopted are inherently misleading. Milavetz, 559 U.S. at 251.

Likewise, plaintiff's attempt to analogize to R.J. Reynolds Tobacco Co. v. FDA, 845 F. Supp. 2d 266 (D.D.C. 2012), is unpersuasive. There, the court considered an FDA rule requiring certain textual warnings and "graphic images" to be printed on cigarette packages. Id. at 269. Assessing only the "graphic-image requirements," the court

concluded that the images were not being used to convey "factual information." The court relied on the government's acknowledgment that the primary purpose of the images was to "elicit negative emotional reactions" and that the images did not depict "common consequence[s]" of smoking but were merely meant to "symbolize[]" its harms. Id. at 273 (emphasis omitted). Thus, the images in that case were not even "literally true." By contrast, plaintiff has not pointed to any part of the disclosure here that communicates anything but "literally true" information about its members' practices.

Second, plaintiff also fails to plausibly allege that the required disclosure is "controversial." The Second Circuit has been clear that a compelled commercial disclosure is not rendered "controversial" merely because the regulated entity does not wish to make that disclosure or because they would prefer to make a different statement on that same topic. See Volokh, 148 F.4th at 87; see also SEC v. City of Rochester, 731 F. Supp. 3d 455, 472073 (W.D.N.Y. 2024) ("Disclosure rules requiring speakers to disclose facts with which the speakers disagree are consistently found not to offend the First Amendment.").

In NYSRA, for example, the Second Circuit applied Zauderer to a law requiring calorie counts to be printed on certain restaurant menus, notwithstanding plaintiff's assertion that "its member restaurants do not want to communicate to their customers that calorie amount should be prioritized among other nutrient amounts." 556 F.3d at 134. The court reasoned that, so long as the government's focus on the required disclosure is "rational," the First Amendment does not bar the

government from mandating "'under-inclusive' factual disclosures." Id. Accordingly, the fact that plaintiff's members would, in the absence of the Act, choose to make a different statement (or none at all) regarding their use of algorithmic pricing does not remove the law from Zauderer's reach. See Volokh, 148 F.4th at 91 ("Social media networks . . . may not want to discuss content moderation policies at all. But that wouldn't remove this regulation from the Zauderer framework.").

Nor, as plaintiff contends, is the disclosure here rendered "controversial" because it requires the speaker to "take sides in a public debate." MTD Opp. 18. Although the Second Circuit has not spoken directly to this consideration, the Supreme Court in NIFLA suggested that certain disclosures that bear on controversial "topic[s]," such as abortion, may not qualify for Zauderer review. See Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA), 585 U.S. 755, 769 (2018); but see CompassCare, 125 F.4th at 67 (applying Zauderer to a state law requiring employers to disclose information regarding an employee's "reproductive health" rights). Plaintiff, however, makes no more than a conclusory assertion that the topics of "machine learning, algorithms, and artificial intelligence" in general, or algorithmic pricing in particular, are "controversial" in any meaningful way. See PI Mtn. 20; see also MTD Opp. 18. And those topics are hardly more controversial than abortion, which was directly at issue in a disclosure law that the Second Circuit recently upheld under Zauderer. See CompassCare, 125 F.4th at 67.

Furthermore, even if we were to assume, arguendo, that the regulation of these technologies is the subject of "robust public debate" and is therefore "controversial," MTD Opp. 18, that does not mean that "the fact that [plaintiff's pricing mechanisms] are what they are" is itself controversial. Volokh, 148 F.4th at 90 (emphasis omitted); see also, e.g., CompassCare, 125 F.4th at 65 ("[T]he policy judgment that motivated the [state law] may be 'controversial' in the same way that the policy judgments underlying Title VII, or minimum wage laws, are controversial. But the existence and contents of the [law] -- and an employer's obligation to comply with it -- is not itself controversial.").

Plaintiff's members are free to utilize algorithmic pricing or not and are free to communicate their own views about the use of such technologies. Plaintiff's members are not required by the disclosure to "t[ake] sides" in any controversy, no less a "heated political" one. See MTD Opp. 18; PI Mtn. 20 (citation omitted). The disclosure "does not require any statement regarding the merits [of algorithmic pricing]" and plaintiff's members "remain free to share with their [customers]" their own views on that matter, CompassCare, 125 F.4th at 66, including their professed view that algorithmic pricing is "socially beneficial," PI Mtn. 20; Compl. ¶ 15. The law does not require any statement "at war" with that belief. MTD Opp. 5.

Additionally, the required disclosure here relates only to practices that plaintiff's members actually employ in dealing with their own customers. See Compl. ¶¶ 3, 5 (alleging that plaintiff's

members use algorithmic pricing); see also N.Y. Gen. Bus. Law
§ 349-a(2) (applying the disclosure requirement to "[a]ny entity" that
publishes an "announcement of personalized algorithmic pricing to a
consumer . . . using personal data specific to such consumer"). Thus,
this is not a case in which the law requires plaintiff's members to
speak about a potentially controversial practice that "in no way
relates to the services that [they] provide." NIFLA, 585 U.S. at 769;
see also Volokh, 148 F.4th at 91 (distinguishing a law that requires
"an anti-abortion crisis pregnancy center to mention abortion
services" from a disclosure that "relate[s] to . . . services" the
regulated party "actually provide[s]"). Plaintiff therefore has not
identified any basis for concluding that the disclosure required here
is anything but "uncontroversial."

Finally, plaintiff argues that the challenged disclosure
requirement falls outside of Zauderer's reach because it does not meet
the threshold requirement that the statement "seek to correct
misleading or deceptive commercial speech." MTD Opp. 16. However,
Zauderer is not limited, as plaintiff would have it, to disclosures
narrowly designed to "correct" specific instances of "deceptive
commercial speech." Id. Zauderer is "broad enough to encompass
nonmisleading disclosure requirements," NYSRA, 556 F.3d at 133, and
has consistently been applied to evaluate commercial disclosure laws
aimed at "the non-disclosure of information material to the consumer,"
Volokh, 148 F.4th at 87 (quoting Expressions Hair Design v.
Schneiderman, 877 F.3d 99, 104 (2d Cir. 2017)).

In NEMA, for example, the Second Circuit applied Zauderer to a Vermont law requiring special labeling of mercury-containing products. 272 F.3d at 115. The court there acknowledged that the law "was not intended to prevent 'consumer confusion or deception' per se, but rather to better inform customers about the products they purchase." Id. (quoting Zauderer, 471 U.S. at 651).

Similarly, the Second Circuit recently found Zauderer review applicable to a law requiring social media networks to publish their content moderation policies, see Volokh, 148 F.4th at 89, as well as to a law requiring employers to provide notification to their employees of their rights under certain state laws, see CompassCare, 125 F.4th at 65-67; see also, e.g., Poughkeepsie Supermarket Corp. v. Dutchess Cnty., 648 F. App'x 157, 158 (2d Cir. 2016) (price sticker requirement intended "to provide complete price information to consumers" satisfied Zauderer). None of these decisions was justified by recourse to specific "misrepresent[ations]" or "misleading" speech that the mandated disclosures aimed to "correct." PI Mtn. 18.

Indeed, the disclosure required here serves to ameliorate "consumer confusion or deception" by ensuring that consumers are better informed about how a merchant has set the displayed price, including the fact that the price may be different for different consumers.[5]

---

[5] Plaintiff alleges that consumers are benefitted by its members' use of algorithmic pricing in the form of lower overall prices. See Compl. ¶¶ 15, 19. But plaintiff points to no precedent suggesting that just because some consumers might in some circumstances benefit from the use of algorithmic pricing, consumers in general have no interest in being accurately informed about its use. Moreover, plaintiff's

This, then, is not a case where "the disclosure requirement is supported by no interest other than the gratification of 'consumer curiosity.'" NEMA, 272 F.3d at 115 n.6 (quoting Int'l Dairy Foods Ass'n v. Amestoy (IDFA), 92 F.3d 67, 74 (2d Cir. 1996)). Plaintiff, for example, does not allege that the required disclosure is of a practice with "no discernable impact on [the] final product." IDFA, 92 F.3d at 73. To the contrary, it is undisputed that plaintiff's members use algorithmic pricing to set the displayed price, which is undoubtedly part and parcel of the terms on which the product is being offered to the consumer.

Finally, the disclosure required by the Act does not "go[] beyond the speaker's own product or service," Safelite, 764 F.3d at 264, or "prevent[]" a would-be speaker "from conveying additional truthful information" of their choosing, Volokh, 148 F.4th at 87 (quoting Expressions Hair Design, 877 F.3d at 104). In the absence of any of these considerations, Second Circuit precedent points clearly to Zauderer as setting forth the appropriate standard of review.

---

assertion that algorithmic pricing "lower[s] overall consumer prices in the aggregate," id. ¶ 15 (emphasis added), does not mean that consumers uniformly benefit from its use or that the practice is never used to charge certain consumers higher prices. Indeed, plaintiff acknowledges that algorithmic pricing is used to lower prices for some consumers (in the form of "promotions") and not for others, which by definition is a form of price discrimination. Id. ¶ 11; see also Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction 13, ECF No. 30 ("PI Opp.") (plaintiff's "members notably do not disavow their use of personal data to charge customers different prices for the same goods").

The Court therefore next evaluates whether it satisfies this standard.

**C. Application**

A commercial disclosure will pass muster under Zauderer so long as it satisfies Zauderer's "reasonable-relationship rule," NEMA, 272 F.3d at 115, and is not "unjustified or unduly burdensome," Zauderer, 471 U.S. at 651. In the commercial disclosure context, the government need not proffer "evidence or empirical data" to support its claimed justification. Conn. Bar Ass'n v. United States, 620 F.3d 81, 97-98 (2d Cir. 2010).

Plaintiff argues that the Act is both unjustified and unduly burdensome because it is directed at "purely hypothetical" harms, unduly burdens plaintiff's members' speech, and is "fatally underinclusive." MTD Opp. 9-13. Defendant argues that the Act satisfies Zauderer review because it is "reasonably related to the State of New York's legitimate interest in 'help[ing] consumers make informed decisions' regarding the purchase of products and services that are priced using algorithms," and because it is neither unjustified nor unduly burdensome. MTD 11-13.

The challenged disclosure is reasonably related to the government's legitimate interest in ensuring that consumers are "inform[ed]" about the terms on which products are offered to them, including the price. NEMA, 272 F.3d at 115; see also NYSRA, 556 F.3d at 133 (Zauderer is "broad enough to encompass nonmisleading disclosure requirements"); Volokh, 148 F.4th at 87 (Zauderer applies to laws

aimed at "the non-disclosure of information material to the consumer" (quoting Expressions Hair Design, 877 F.3d at 104)).

Although the Act does not have an extensive legislative history, its stated aims are consistent with this goal. The Act was introduced as part of the proposed Executive Budget, which explained that its purpose was to "enhance consumer protections" by "enhanc[ing] consumers' awareness of sellers that offer or sell goods or services at a price based on personalized consumer data." FY 2026 N.Y. State Exec. Budget, Transp., Econ. Dev. & Env't Conservation Art. VII Legis., Memorandum in Support at 20, https://www.budget.ny.gov/pubs/archive/fy26/ex/artvii/ted-memo.pdf (last visited Oct. 6, 2025).

A substantially similar version of the Act was also introduced as a stand alone bill in the New York State Senate. See S7033, 2025-2026 Legis. Sess. (N.Y. 2025). Citing to a 2025 Federal Trade Commission (FTC) report,[6] the Sponsor's Memo noted that companies can use

---

[6] See Fed. Trade Comm'n, FTC Surveillance Pricing 6(b) Study: Research Summaries; A Staff Perspective (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/p246202_surveillancepricing6bstudy_researchsummaries_redacted.pdf ("FTC Surveillance Pricing"). Plaintiff complains that the FTC publication, which was "not an exhaustive declaration of [the FTC's] findings" and comprised only "initial observations," demonstrates that the State's stated concerns are "hypothetical." MTD Opp. 10; FTC Surveillance Pricing at 1. The fact that the publication contained only "initial findings" does not, however, mean that those findings were speculative or hypothetical. See FTC Surveillance Pricing at 1. The FTC cautioned that the "summaries d[id] not represent the full breadth of information, degree of nuance, or level of detail with which staff are currently working," but nonetheless sought to share what "staff [had] learn[ed] so far" about the types of algorithmic pricing tools being offered, how those tools work "to target prices or segment users," the

algorithmic pricing to "charge[] [consumers] different prices for the same product or service." Thus, the bill "aim[ed] to protect New York consumers by requiring disclosures when prices are based on personal data" in order to "increase transparency, promote fairness, and help consumers make informed decisions." Id.

Pointing to NIFLA, plaintiff argues that the disclosure requirement is aimed at a "purely hypothetical" problem and is therefore unjustified. See MTD Opp. 9 (citing NIFLA, 585 U.S. at 776-77). But, by plaintiff's own admission, its members use personalized algorithmic pricing, including for the purpose of offering different prices to different consumers. See Compl. ¶¶ 3, 5, 11. Moreover, in NIFLA, the Court concluded that the disclosure requirement was aimed at "purely hypothetical" harms because the government had denied that the mandated disclosure was aimed at communicating information that a consumer might not already have. See 585 U.S. at 776 ("At oral argument . . . California denied that the justification for the [challenged act] was that women 'go into [crisis pregnancy centers] and they don't realize what they are.'"). By contrast, the government's stated interest here is to ensure that consumers are informed about the use of personalized algorithmic

"data sources and types of data collected," and their "effects on prices, sales, revenue, or consumers." Id. at 2-3. Accordingly, the FTC's research summary indicated that, based on the tools reviewed by staff, algorithmic pricing tools can be used to generate individualized pricing and promotions based on individual consumer data. See id. at 3, 5-6. The non-exhaustive nature of the publication does not make the existence of such technology "hypothetical."

pricing. And every indication is that consumers would not know that a
price was set using their personal information without a disclosure.
See Hayes v. N.Y. Att'y Grievance Comm., 672 F.3d 158, 167-68 (2d Cir.
2012) (finding "no First Amendment infirmity" in a compelled disclosure
based on the "self-evident" "risk that some members of the public"
would, in the absence of the disclosure, reach a contrary conclusion).
Accordingly, plaintiff's reliance on NIFLA for the proposition that
the disclosure is directed at a "purely hypothetical" problem is
unavailing.

Moreover, the state's interest in ensuring that consumers are
informed about the terms on which products and services are offered
to them is a cognizable interest under Zauderer. For example, the
Second Circuit recently concluded that a disclosure requirement aimed
at "ensur[ing] that [social media] users are fully informed about the
terms of their engagement with a social media network," thereby
"enabling them to make more informed choices about where they spend
their screen time," would satisfy Zauderer review. Volokh, 148 F.4th
at 91. A disclosure requirement that seeks to enable consumers to make
"informed choices" by providing them with information material to
their consumption decisions thus falls comfortably within Zauderer's
reach. Id.; see also Expressions Hair Design, 877 F.3d at 104 (Zauderer
applies to laws aimed at "the non-disclosure of information material
to the consumer").

Additionally, as noted above, the disclosure here reasonably
bears on the "final product" and therefore rises above above mere

gratification of "consumer curiosity." IDFA, 92 F.3d at 73-74 (concluding that "consumer interest" alone could not justify a compelled disclosure directed at a "production method" with "no discernable impact on [the] final product"); see also NEMA, 272 F.3d at 115 & n.6 (distinguishing IDFA and reasoning that a disclosure directed at "better inform[ing] consumers about the products they purchase," rather than "'consumer confusion or deception' per se," satisfied Zauderer review).

The Act's disclosure requirement also is not "unduly burdensome." Zauderer, 471 U.S. at 651. The disclosure requirement "does not impair [plaintiff's members'] ability to convey their own beliefs" about algorithmic pricing, including its purported benefits. CompassCare, 125 F.4th at 67; see also Milavetz, 559 U.S. at 250 (disclosure requirement "does not prevent [regulated parties] from conveying any additional information"). It does not "interfere with [plaintiff's members'] greater message [or] mission" or prevent them from sharing their view that consumers will be benefitted by algorithmic pricing "in the aggregate." Id. at 66; MTD Opp. 12 (citing Compl. ¶¶ 15, 33). Plaintiff's members remain free to communicate that message and any additional message of their choosing.

Plaintiff contends that, in practice, the disclosure requirement nonetheless "tends to displace [its members'] own speech" because there is limited "pixel space" on any given online product page and the Act requires plaintiff's members to "sacrifice" a meaningful portion of that limited space to the mandatory disclosure. MTD Opp.

13; see also PI Mtn. 10. Disclosure requirements, however, often pertain to displays with limited space. See, e.g., NEMA, 272 F.3d at 107 (product labeling). And the requirement that some of that space be dedicated to a mandatory disclosure does not render the disclosure "intrinsically burdensome," even if the speaker would prefer to use that space for another purpose. Zauderer, 471 U.S. at 653 n.15; see also, e.g., R J Reynolds Tobacco Co. v. FDA, 96 F.4th 863 (5th Cir. 2024) (rejecting claim that mandated tobacco-use warnings are "unduly burdensome" because "plaintiffs can still speak on 80% of their advertisements, and they still control more than 50% of the total surface area of their cigarette packages").

The cases that plaintiff points to at most indicate that a disclosure requirement is "unduly burdensome" if it has the effect of "drown[ing] out" the regulated party's own speech. NIFLA, 585 U.S. at 778. In NIFLA, for example, the Court reasoned that the nature of the disclosure and the level of "'detail required . . . effectively rule[d] out' the possibility" that the regulated party would speak at all. Id. (quoting Ibanez v. Fl. Dep't of Bus. & Pro. Regul., 512 U.S. 136, 146 (1994)).

Plaintiff has not plausibly alleged that this is the case here. The mandatory one-sentence disclosure may be in any font or format, so long as it "easily visible" and "provided on, at, or near . . . [the] price." N.Y. Gen. Bus. Law § 349-a(1)(b), (2). Plaintiff's conclusory allegation that its members "will have to surrender a significant amount" of "[t]he pixel space on any given product page"

is not plausible in light of the modest nature of the disclosure the Act imposes. See Compl. ¶ 27. And, in any event, the fact that a disclosure mandate might theoretically require plaintiff's members to "surrender" a "significant amount" of "pixel space" does not plausibly indicate that complying with the mandate will "'rule out' the possibility" that plaintiff's members will speak at all. NIFLA, 585 U.S. at 778 (quoting Ibanez, 512 U.S. at 146). This is especially so given that plaintiff's allegations all pertain to online "pixel space," which by its nature is not so space-limited as the traditional print advertising on which disclosure requirements have consistently been upheld.

Finally, the Act is not rendered "unduly burdensome" by the presence of limited exceptions. Plaintiff does not explain why exempting certain speakers from the Act's coverage increases the burden to its members of complying with the disclosure requirement. But, in any event, it is well-established that a commercial disclosure requirement need "not get at all facets of the problem it is designed to ameliorate." Zauderer, 471 U.S. at 651 n.14. A disclosure requirement is not rendered constitutionally deficient merely because it is "under-inclusive." Id. To the extent that plaintiff's argument is that the Act is "so grossly underinclusive that it will not advance the State's interests" at all, that allegation is implausible. MTD Opp. 13. Only insurance companies and certain financial institutions are exempted, both of which are already subject to independent regulatory regimes. See N.Y. Gen. Bus. Law § 349-a(3). There is thus

every indication that the the disclosure requirement reaches the vast majority of merchants with whom consumers interact.

## IV.  Conclusion

For the foregoing reasons, plaintiff has not plausibly alleged that the challenged disclosure requirement violates the First Amendment. Thus, plaintiff also cannot demonstrate an entitlement to preliminary injunction relief.

Accordingly, defendant's motion to dismiss, ECF No. 20, is GRANTED and plaintiff's claims are DISMISSED with prejudice. The motion for a preliminary injunction, ECF No. 9, is DISMISSED as moot.

The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

New York, NY
October 8, 2025

JED S. RAKOFF, U.S.D.J.